

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-20-1999

# United States v Rodia

Precedential or Non-Precedential:

Docket 98-5522

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation
"United States v Rodia" (1999). *1999 Decisions.* Paper 288.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/288

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 20, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 98-5522

UNITED STATES OF AMERICA

v.

JOSEPH RODIA
Appellant

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Crim. No. 97-cr-00128)
District Judge: Honorable Mary Little Cooper

Argued: July 12, 1999

Before: BECKER, Chief Judge, ROTH and RENDELL,
Circuit Judges.

(Filed October 20, 1999)

        LISA VAN HOECK, ESQUIRE
          (ARGUED)
        Assistant Federal Public Defender
        22 South Clinton Avenue
        Station Plaza #4, 4th Floor
        Trenton, NJ 08609

        Counsel for Appellant

FAITH S. HOCHBERG, ESQUIRE
United States Attorney
NORMAN J. GROSS, ESQUIRE
  (ARGUED)
Assistant United States Attorney
Office of the United States Attorney
Mitchell S. Cohen Courthouse
Fourth & Cooper Streets
Camden, NJ 08101-2098

GEORGE S. LEONE, ESQUIRE
Assistant United States Attorney
Office of the United States Attorney
970 Broad Street, Room 700
Newark, NJ 07102

Counsel for Appellee

OPINION OF THE COURT

BECKER, Chief Judge.

This appeal requires us once again to determine, in the wake of United States v. Lopez, 514 U.S. 549 (1995), the constitutionality of a statute criminalizing an activity that is not directly linked to interstate commerce. The precise question before us is whether it was within Congress's power under the Commerce Clause to enact 18 U.S.C. S 2252(a)(4)(B), which imposes criminal liability on individuals who possess child pornography that has not itself traveled in interstate commerce as long as one of the materials from which the pornography was created--in this case, Polaroid film--has so traveled.

Unlike the statute in question in Lopez, this statute has a jurisdictional element or "hook"--that is, a clause that purports to ensure that the law only covers activity that has a substantial effect on interstate commerce. We conclude, however, that the jurisdictional element in S 2252(a)(4)(B) does not achieve this goal. Accordingly, we must consider whether Congress could reasonably have believed that the intrastate possession of child pornography that has been made using products that traveled interstate

has a substantial effect on the interstate commerce in child pornography.

Although we are not without misgivings in view of the breadth of the regulation at issue, we conclude that Congress rationally could have believed that intrastate possession of pornography has substantial effects on interstate commerce. Intrastate possession likely fosters the possessor's demand for additional child pornography, some of which will come from interstate sources. Hence, discouraging the intrastate possession of pornography will cause some of these child pornographers to leave the realm of child pornography completely, which in turn will reduce the interstate demand for pornography--the very activity Congress wished to suppress through regulation. This point is buttressed by the fact that Congress has historically regulated interstate commerce in child pornography, and that Congress hoped to close a remaining loophole in the law by criminalizing intrastate possession of the same. We therefore will affirm the judgment of the District Court convicting Rodia under S 2252(a)(4)(B).

I. Facts and Procedural History

In 1991, local law enforcement officials in New Jersey arrested Joseph Rodia and filed state charges against him, including attempted aggravated sexual assault, endangering the welfare of a child, and manufacturing child pornography. After a New Jersey grand jury indicted Rodia on these charges, he fled and was eventually arrested in Ohio for sexually assaulting a child there. After pleading guilty to two counts of endangering the welfare of a child, he received a four-year sentence. While serving that sentence in Ohio, federal law enforcement officials brought a charge against him in the District Court for the District of New Jersey, alleging a violation of the Child Restoration and Penalties Act of 1990, 18 U.S.C. S 2252 ("CRPA"), which criminalizes the possession of child pornography when the pornography has traveled in interstate commerce or when the materials from which the pornography was created traveled in interstate commerce. The material creating the purported jurisdictional hook in this case was the Polaroid film with which Rodia's pornographic

3

photographs were taken. It is undisputed that Polaroid film has never been manufactured in New Jersey and that it was transported there via interstate commerce. Before trial, Rodia moved to dismiss the federal indictment on the ground that Congress had exceeded its powers under the Commerce Clause in enacting the second clause of S 2252(a)(4)(B), since that clause regulates the purely intrastate possession of child pornography. The District Court denied the motion. Rodia later pled guilty, admitting that he knowingly possessed numerous photographs that constituted child pornography, including three Polaroid photos of naked boys in various sexually explicit poses. The District Court accepted his plea and sentenced him to a twenty-one month prison sentence, followed by three years of supervised release with special conditions.

Rodia did not preserve his right to appeal by entering a conditional guilty plea. See Fed. R. Crim. P. 11(a)(2). However, since the issue presented goes to the jurisdiction of the District Court, we have jurisdiction over his appeal. See United States v. Bishop, 66 F.3d 569, 572 n.1 (3d Cir. 1995). Our review of the statute's constitutionality is plenary, though we must respect Congress's ample discretion to determine the appropriate exercise of its Commerce Clause authority. See United States v. Rybar, 103 F.3d 273, 278 (3d Cir. 1996). In engaging in this review, we must ascertain whether Congress "could rationally conclude that the regulated activity substantially affects interstate commerce." Id. Our inquiry is restricted to whether any state of facts--either facts known or facts that could reasonably be assumed--affords support for that conclusion. See Pic-A-State PA, Inc. v. Reno, 76 F.3d 1294, 1302 (3d Cir. 1996). If such a set of facts exists, we then must consider whether "the means chosen by Congress are reasonably adapted to the end permitted by the Constitution." Id. (quoting Hodel v. Virginia Surface Mining & Reclamation Ass'n, 452 U.S. 264, 276 (1981)).

II. The Parties' Contentions

The version of 18 U.S.C. S 2252 that was in place in 1991, when Rodia was arrested, provided in relevant part:

4

(a) Any person who . . . (4) either . . . (B) knowingly possesses 3 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, if -- . . .

(i) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and (ii) such visual depiction is of such conduct; shall be punished as provided in subsection (b) of this section.

18 U.S.C. S 2252(a)(4)(B) (emphasis added).

Rodia was indicted under the second clause of subsection (B) of the statute, which grounds jurisdiction solely on the fact that the materials from which the pornography was created were shipped in interstate commerce. This is the only part of the statute he challenges; he does not contest the constitutionality of the clause regulating pornography that itself has traveled in interstate commerce. Thus, when we discuss S 2252, we are referring only to the clause that prohibits the intrastate possession of child pornography made from materials that traveled interstate. In formulating his constitutional challenge, Rodia relies heavily on United States v. Lopez, 514 U.S. 549 (1995). It is therefore necessary to summarize that decision here.

A.

In Lopez, the Court struck down the Gun Free School Zones Act ("GFSZA") on the ground that Congress exceeded its Commerce Clause power in passing the Act. The GFSZA made it a federal offense for any individual to knowingly possess a firearm within a school zone. The Court described the three broad categories of activity that Congress may properly regulate--the channels of interstate commerce, the instrumentalities of interstate commerce, and those activities that have a substantial relation to interstate commerce--and noted that, in light of the activity regulated

5

(gun possession), the GFSZA could be upheld, if at all, only if it fell into the third category. See id. at 559.

In concluding that the statute was unconstitutional under the third category of regulation, the Court based its decision on two major grounds and a minor ground. Itfirst noted that the GFSZA, a criminal statute that had"nothing to do with `commerce' or any sort of economic enterprise," was not a "part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." Id. at 561. Though the government (and four Justices in dissent) argued that guns in school zones result in violent crime, which harms the educational environment and makes for less productive citizens, the Court found the connection between gun possession on school grounds and commercial transactions too attenuated to say that such possession substantially affected interstate commerce. The Court also rejected the argument that the costs of crime impact the well-being of the nation as a whole, since it would follow from that argument that Congress could regulate all violent crime.

Second, the Court noted that the GFSZA contained "no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." Id. at 561. The Court thus sought some guarantee that the behavior being regulated has a sufficient nexus to interstate commerce once the underlying facts of the case are proven. Finally, though the Court acknowledged that Congress is normally not required to make findings in order to legislate, it commented on the dearth of congressional findings about the effect of gun possession on interstate commerce, which left the Court unable to evaluate the reasonableness of Congress's judgment. See id. at 562-63.

B.

Rodia's argument is two-pronged. First, while acknowledging that S 2252 has a jurisdictional hook insofar as it requires that the materials from which the pornography has been created have traveled in interstate commerce, he contends that a statute cannot be upheld

6

against a Commerce Clause challenge simply because it contains a jurisdictional element. A jurisdictional element, as the term has been used in and after Lopez, refers to a provision in a federal statute that requires the government to establish specific facts justifying the exercise of federal jurisdiction in connection with any individual application of the statute. See United States v. Harrington, 108 F.3d 1460, 1465 n.2 (D.C. Cir. 1997); see also Lopez, 514 U.S. at 561 (noting that the Gun-Free School Zones Act "has no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that . . . have an explicit connection with or effect on interstate commerce"); United States v. Pierson, 139 F.3d 501, 503 (5th Cir. 1998) (noting that a jurisdictional element expressly requires a nexus between the activity regulated and interstate commerce, thus ensuring that Congress exercised its Commerce Clause power to reach a discrete set of criminal acts that have an explicit connection with or effect on interstate commerce). Rodia contends that the jurisdictional element in S 2252(a)(4)(B) fails to ensure that the activity Congress wanted to regulate has an actual nexus to interstate commerce, since it does not require that the final product regulated--child pornography--traveled in interstate commerce.

Second, Rodia submits that simple intrastate possession of child pornography does not fit into any of the three categories of interstate commerce that are proper subjects of congressional regulation: (i) channels of interstate commerce; (ii) instrumentalities of interstate commerce; and (iii) activities that substantially affect interstate commerce. For the reasons explained infra Part IV and n.3, categories (i) and (ii) are not at issue in this case. With regard to the third category, he claims victory on the grounds that possession of child pornography is not of an economic or commercial nature, relying on the statute's legislative history in support of his claim. He emphasizes this point by making a classic slippery slope argument: If "Congress can regulate the purely intrastate activity of Rodia simply because the blank film traveled interstate, then there would be no activity beyond the power of Congress to regulate." Def. Br. at 6. If we uphold the statute, he forcefully argues, Congress could prohibit the

7

shoplifting in New Jersey of a candy bar made in Pennsylvania, or the rape of a person who at one time has traveled interstate, simply because there is a trivial interstate nexus to the intrastate activity being regulated.

The government defends the statute on two grounds. First, it submits that S 2252(a)(4)(B)'s express jurisdictional requirement is sufficient to render the statute constitutional. Second, it contends that even if we deem the jurisdictional element insufficient to make the statute constitutional, Congress validly exercised its Commerce Clause power by attempting to suppress the intrastate demand for child pornography, which would in turn substantially affect interstate commerce by decreasing the demand for the interstate supply of child pornography.

In support of its position, the government points out that the three courts to decide this question, including two courts of appeals, have upheld the constitutionality of the statute. See United States v. Bausch, 140 F.3d 739 (8th Cir. 1998), cert. denied, 119 S. Ct. 806 (1999); United States v. Robinson, 137 F.3d 652 (1st Cir. 1998); United States v. Winningham, 953 F. Supp. 1068, 1074 n.13 (D. Minn. 1996). We turn first to the jurisdictional element.

III. The Jurisdictional Element

As we have noted, the government contends that the presence of the jurisdictional element in S 2252 is by itself sufficient to render the clause at issue constitutional. However, in United States v. Bishop, 66 F.3d 569 (3d Cir. 1995), we held:

>       The mere presence of a jurisdictional element . . . does not in and of itself insulate a statute from judicial scrutiny under the Commerce Clause, or render it per se constitutional. To the contrary, courts must inquire further to determine whether the jurisdictional element has the requisite nexus with interstate commerce. We must, therefore, determine whether the jurisdictional component in this case limits the statute to items that have an explicit connection with, or effect upon, interstate commerce.

8

Id. at 585. We went on to make that determination, concluding that the carjacking statute's jurisdictional element ensured that the car involved in the carjacking had an explicit connection with interstate commerce.

The government refers us to three later cases that, it contends, establish that we need look no further than the jurisdictional element. In United States v. Rybar, 103 F.3d 273, 285 (3d Cir. 1996), we noted in passing that the Supreme Court's decision in United States v. Bass, 404 U.S. 336 (1971), "merely signified that a statute's inclusion of a jurisdictional element is a condition sufficient to establish its validity under the Commerce Clause." However, we made this comment only in response to the defendant's argument that the absence of a jurisdictional element in Rybar was fatal to the statute involved in that case. Indeed, the statute at issue in Rybar contained no jurisdictional element, and thus this statement about the effect of the presence of such an element was focused on the issue before us and is clearly dicta.[1]  In contrast, our

_____

1. In addition, we believe that Rybar overstates the holding of Bass. In Bass, the Court had to interpret a gun possession statute, which applied to anyone "who receives, possesses, or transports in commerce or affecting commerce any firearm." The government argued that "in commerce or affecting commerce" applied only to the verb "transports"; the Court rejected this reading, holding that "in commerce or affecting commerce" applied also to "possesses" and "receives." The Court did not state that a formal, jurisdictional element would be sufficient to render a statute constitutional. Rather, it merely enforced the underlying constitutional requirement that the activity regulated by federal statute have some demonstrated nexus with interstate commerce. A later Supreme Court case discussing Bass supports this reading. In Scarborough v. United States, 431 U.S. 563 (1977), the Court described Bass as follows:

>        Since "[a]bsent proof of some interstate commerce nexus in each
>        case S 1202(a) dramatically intrudes upon traditional state criminal
>        jurisdiction," we were unwilling to conclude, without a "clearer
>        statement of intention," that Congress meant to dispense entirely
>        with a nexus requirement in individual cases.

>         It was unnecessary in Bass for us to decide what would constitute
>        an adequate nexus with commerce as the Government had made no
>        attempt to show any nexus at all.

ruling in Bishop was directed toward the precise issue we address.

We also believe that Bishop is sound. A hard and fast rule that the presence of a jurisdictional element automatically ensures the constitutionality of a statute ignores the fact that the connection between the activity regulated and the jurisdictional hook may be so attenuated as to fail to guarantee that the activity regulated has a substantial effect on interstate commerce. See Lopez, 514 U.S. at 561 (implying that jurisdictional elements are useful only when they can ensure, through a case-by-case inquiry, that the regulated activity affects interstate commerce); United States v. Jones, 178 F.3d 479, 480 (7th Cir. 1999) (noting that the jurisdictional element of S 844(i), even if proven by the government, did not establish a substantial connection to interstate commerce; and therefore, looking beyond the jurisdictional element to assess the statute's constitutionality); United States v. Pappadopoulos, 64 F.3d 522, 527 (9th Cir. 1995) (illustrating that a statutorily imposed requirement of a jurisdictional nexus to interstate commerce will not insulate the statute from judicial review). We discuss in the margin the other post-Bishop cases on which the government relies.2

_____

Id. at 568 (citations omitted). It is a big leap from Bass's specific holding
--that the Court would read the statute in such a way as to ensure that the government had to prove a nexus between the gun at issue and interstate commerce--to the broad proposition that a jurisdictional element will always guarantee a statute's constitutionality.

2. The government reads United States v. Gaydos, 108 F.3d 505, 508 (3d Cir. 1997), to stand for the proposition that the simple presence of a jurisdictional element rendered the statute at issue constitutional. There,
however, the panel simply concluded that the jurisdictional element contained in the federal arson statute, 18 U.S.C.S 844(i), ensured that the statute only applied to arson that substantially affected interstate commerce. The government also relies on United States v. Gateward, 84 F.3d 670 (3d Cir. 1996), which further explicated Bass and Scarborough. However, in Gateward, we did no more than conclude that the specific jurisdictional element in the case adequately performed the function of guaranteeing the nexus between firearm possession and commerce. The panel stated:

10

In this case, the jurisdictional element--the requirement that precursor materials like film or cameras moved in interstate commerce--is only tenuously related to the ultimate activity regulated: intrastate possession of child pornography. A jurisdictional element is only sufficient to ensure a statute's constitutionality when the element either limits the regulation to interstate activity or ensures that the intrastate activity to be regulated falls within one of the three categories of congressional power. See Bishop, 66 F.3d at 594 (Becker, J., dissenting); see also United States v. Wilson, 73 F.3d 675, 685 (7th Cir. 1995) ("[I]n Lopez, the Court simply did not state or imply that all criminal statutes must have such an element, or that all statutes with such an element would be constitutional, or that any statute without such an element is per se unconstitutional."); Andrew St. Laurent, Reconstituting United States v. Lopez: Another Look at Federal Criminal Law, 31 COLUM. J. L. & SOC. PROBS. 61, 112 (1998) ("A purely nominal jurisdictional requirement, that some entity or object involved in the crime be drawn from interstate commerce, does nothing to prevent the shifting of[the federal/state] balance in favor of the federal government. As has been amply demonstrated, virtually all criminal actions in the United States involve the use of some object that has passed through interstate commerce.").

As a practical matter, the limiting jurisdictional factor is almost useless here, since all but the most self-sufficient child pornographers will rely on film, cameras, or chemicals that traveled in interstate commerce and will therefore fall within the sweep of the statute. At all events, it is at least doubtful in this case that the jurisdictional element adequately performs the function of guaranteeing that the final product regulated substantially affects interstate

---

We do not understand Lopez to undercut the Bass/Scarborough proposition that the jurisdictional element [which required that the gun have been possessed `in or affecting commerce'] keeps the felon firearm law well inside the constitutional fringes of the Commerce Clause.

84 F.3d at 671.

11

commerce. Because we will affirm the statute on other grounds, we proceed to examine the nexus between interstate commerce and the activity regulated.

## IV. Does Intrastate Possession of Child Pornography Affect Interstate Commerce?

As discussed above, see supra Part II.A., the Supreme Court has identified three broad categories of activity that Congress can regulate using its commerce power: (i) the channels of interstate commerce; (ii) instrumentalities of interstate commerce; and (iii) those activities having a substantial relation to interstate commerce. See Lopez, 514 U.S. at 559. Neither of the parties argues that category (i) is at issue. The government contends that we should analyze S 2252 under categories (ii) and (iii). However, our description of "instrumentalities" of interstate commerce in Bishop makes clear that we are not confronted with the congressional regulation of such instrumentalities in this case.3 We therefore turn to category (iii) and to the heart of

_____

3. In Bishop, we stated:

> Instrumentalities differ from other objects that affect interstate
> commerce because they are used as a means of transporting goods
> and people across state lines. . . . It would be anomalous,
therefore,
> to recognize [trains, planes, and highways as] categories of
> instrumentalities but to suggest that the similarly mobile
automobile
> is not also an instrumentality of interstate commerce.

66 F.3d at 588. Though the dissent disagreed with that conclusion, it, too, emphasized that "courts have, to date, appropriately limited [category two's] application to congressional regulation of instrumentalities actually engaged in interstate commerce, or objects such as railcars . . . , which are integrally related to an interstate commerce network." Id. at 597 (Becker, J., dissenting); see also Overstreet v. North Shore Corp., 318 U.S. 125 (1943) (treating a bridge as an instrumentality); Shreveport Rate Cases, 234 U.S. 342 (1914) (interstate rail carriers); Southern R.R. Co. v. United States, 222 U.S. 20 (1911) (railcars). Thus, category (ii) is inapt, and we will consider the statute only under category (iii), referring to the relevant inquiry in this case as whether it was reasonable for Congress to believe that the behavior regulated substantially affects interstate commerce. See United States v. Bausch, 140 F.3d 739 (8th Cir. 1998), cert. denied, 119 S. Ct.

12

the matter: whether Congress had a rational basis for believing that the intrastate possession of pornography has a substantial effect on interstate commerce. We analyze this question through the prism of Wickard v. Filburn, 317 U.S. 111 (1942), and its progeny. We also consider the relevance of the fact that Congress has long regulated interstate commerce in child pornography, and that, in enacting the subsection of S 2252 at issue here, Congress was seeking to close a loophole in that statute so as to better achieve its goal. After discussing "substantial effect," we will address the reasonableness of Congress's chosen means as a way to achieve its desired goals.

A.

There is no dispute about the veritable tautology that interstate trafficking in child pornography has an effect on interstate commerce. Nevertheless, a brief summary of the legislative history of S 2252, in which congressional findings explicated the role of child pornography in interstate commerce, offers an important background to the ultimate issue we must decide: whether Congress could have believed that the intrastate possession of pornography substantially affects interstate commerce. With a clear understanding of the role child pornography plays in interstate commerce, it is easier to comprehend both Congress's efforts to regulate the industry and its subsequent attempt in 1990 to close a loophole in those regulations by enacting the clause of S 2252 that is at issue here. We discuss these findings even though they were not made in direct support of the 1990 amendments, for reasons set forth in the margin.4

_____

806 (1999) (same); United States v. Robinson, 137 F.3d 652 (1st Cir. 1998) (analyzing and upholding constitutionality ofS 2252 under category (iii)); but see United States v. Winningham, 953 F. Supp. 1068, 1074 n.13 (D. Minn. 1996) (finding S 2252 constitutional under category (ii)).

4. Despite the fact that the findings contained in the extensive legislative history of the statute were not made in relation to the 1990 amendments to S 2252, we think that, under Supreme Court and Third Circuit

13

In 1978, the Senate Report accompanying the passage of the original Protection of Children Against Sexual Exploitation Act (the precursor to the CRPA) stated:

> There is a substantial amount of trafficking in the United States today in pornographic materials [of children] . . . . The hearings and staff investigations . . . have led us to the following conclusions: that child pornography and child prostitution have become highly organized, multimillion dollar industries that operate on a nationwide scale [and] that such prostitution and the sale and distribution of such pornographic materials are carried on to a substantial extent through the mails and other instrumentalities of interstate and foreign commerce.

S. Rep. No. 95-438, at ___ (1977), reprinted in 1978 U.S.C.C.A.N. 70, ___. A 1986 amendment to the Act included legislative findings that stated: "[C]hild exploitation has become a multi-million dollar industry, infiltrated and operated by elements of organized crime, and by a nationwide network of individuals openly advertising their desire to exploit children." Pub. L. No. 99-591, 100 Stat. 3341-74 (1986). A 1988 amendment, which broadened S 2252(a)(1) to encompass the transmission by computer of child pornography in interstate commerce, highlights the fact that child pornography had begun to travel in interstate commerce by yet another means, emphasizing the increasingly commercial nature of child pornography.

Congress's conclusion that a substantial interstate market in child pornography exists seems an eminently

_____

precedent, we should consider these congressionalfindings as we review the statute's constitutionality. See Maryland v. Wirtz, 392 U.S. 183, 190 n.12 (1968) (holding that where Congress had earlier passed related legislation with relevant findings, subsequent legislation was "presumably based on similar findings and purposes with respect to the areas newly covered"); Rybar, 103 F.3d at 279-81 (considering legislative history unrelated to the specific provision at issue in that case and relying on the "history of the legislative history" of federal gun control to illustrate the link between the behavior regulated and its effect on commerce).

14

reasonable one. But since the statutory subsection at issue in this case regulates purely intrastate possession of child pornography, we must explore the relationship between intrastate possession of child pornography and interstate commerce in child pornography.

B.

In the wake of the Interstate Commerce Act and the Sherman Antitrust Act, which ushered in a new era of federal regulation, the Supreme Court subjected laws passed pursuant to the Commerce Clause to a "direct/indirect" test, which allowed Congress only to regulate activities that directly affected interstate commerce. See A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 546 (1935). However, it soon became apparent that, if the Commerce Clause were read to forbid Congress from regulating anything but those goods that actually traveled (and those commercial activities that actually took place) between states, Congress's attempts to regulate interstate commerce would be severely hindered because some local activities or goods are so intertwined with interstate commerce that it is necessary to control the local behavior to ensure the efficacy of interstate regulation. See NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 37 (1937).

In Wickard v. Filburn, the Supreme Court confronted this problem head on. Filburn, a farmer, sought a declaration that the Agricultural Adjustment Act, which imposed penalties on crops produced in excess of the Act's quotas, was unconstitutional. Filburn alleged that Congress had exceeded its Commerce Clause power in enacting a statute that extended federal regulation to wheat production that was intended not for commerce but only for personal consumption on his farm. See 317 U.S. at 118. The Court held that Congress had the authority to regulate singular instances of intrastate activity when such events, taken in the aggregate, might ultimately have a substantial effect on interstate commerce. See id. at 125 ("[E]ven if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by

15

Congress if it exerts a substantial economic effect on interstate commerce."); see also Rybar, 103 F.3d at 283.

Since that time, the Court has repeatedly affirmed that the Commerce power extends to

> those activities intrastate which so affect interstate commerce, or the exertion of the power of Congress over it, as to make regulation of them appropriate means to the attainment of a legitimate end, the effective execution of the granted power to regulate interstate commerce.

Hodel, 452 U.S. at 277 (quoting United States v. Wrightwood Dairy Co., 315 U.S. 110, 119 (1942)). Lopez teaches, however, that the Wickard line of cases "may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government." Lopez, 514 U.S. at 556–57.

In Rybar, we relied on Wickard's reasoning to reject a Commerce Clause challenge to 18 U.S.C. S 922(o), which makes it unlawful "for any person to transfer or possess a machinegun." The defendant, a machine gun owner, argued that the statute failed the "substantially affects" test, since it governed purely intrastate possession of machine guns. See Rybar, 103 F.3d at 277–78. After reviewing the legislative history of gun control, we concluded that Congress might well have contemplated that the regulated activity of machine gun possession, when occurring in the aggregate, substantially affected commerce, and that by instituting a "demand-side measure to lessen the stimulus that prospective acquisition would have on the commerce in machine guns," Congress did not exceed the limits of the Commerce Clause. Id. at 283.

In other words, it was permissible for Congress to attempt to reduce the demand for machine guns, even by regulating purely intrastate behavior, because the effect of that reduction in intrastate demand might well be to limit the flow of those weapons into states, thus reducing the interstate commerce in those weapons. See also United

16

States v. Franklyn, 157 F.3d 90, 96 (2d Cir. 1998) (concluding that S 922(o) "is a reasonable measure for choking off the traffic in machine guns, which may be constricted on the supply side through prohibition of transfers as well as on the demand side by criminalizing possession"). We acknowledged a similar principle in Bishop, where we stated, "[I]f a criminal activity is rationally believed to be one of the conduits of a nationwide and international pipeline of illegal activity, Congress may justifiably step in and regulate that activity although it is wholly intrastate." 66 F.3d at 585. Even more to the point is Robinson, a case factually indistinguishable from Rodia's, where the First Circuit considered market demands when it held:

> By outlawing the purely intrastate possession of child pornography in S 2252(a)(4)(B), Congress can curb the nationwide demand for these materials. We believe that such possession, "through repetition elsewhere," helps to create and sustain a market for sexually explicit materials depicting minors.

137 F.3d at 656 (quoting Lopez, 514 U.S. at 567).

C.

There is a subtle transformation at work here. In Wickard, the goods at issue--the wheat produced and consumed by the farmer--were being substituted for the interstate wheat that the statute attempted to regulate. The supply and demand analysis there, which resulted in the conclusion that intrastate growing of wheat had a substantial effect on the interstate market in wheat, required few assumptions: home-grown wheat acts as a direct substitute for wheat purchased in commerce, including interstate commerce. However, as the cases just cited indicate, courts often have adopted Wickard's generic principle--that intrastate activity, if repeated, may substantially affect interstate commerce--in situations that are economically distinct from Wickard and that require a greater number of assumptions before the connection between intrastate and interstate activity becomes clear. For instance, many courts have applied the Wickard

17

principle to criminal statutes, concluding that suppressing the intrastate demand for a good (for example, by criminalizing possession of guns or drugs) would have a substantial impact on interstate commerce by affecting the supply of that good. See Franklyn, 157 F.3d at 96; Proyect v. United States, 101 F.3d 11, 13–14 & n.1 (2d Cir. 1996); Bishop, 66 F.3d at 584–85.

In many cases, this will be a reasonable assumption. We note, however, that the latter economic model is different from Wickard's substitution analysis, a fact that many courts have glossed over. In addition, a number of courts have applied Wickard's aggregation concept to all activities, economic and non-economic, without acknowledging"that Lopez approvingly discussed the aggregation principle only in conjunction with economic activity." United States v. Hickman, 179 F.3d 230, 238 (5th Cir. 1999) (per curiam) (Higginbotham, J., dissenting). Nevertheless, while there may not be a precise analytical fit between substitution situations like Wickard and supply-affecting situations like the one at issue here, the weight of authority has assumed that Wickard's generic principle may be applied across economic frameworks, to both criminal and civil regulations, so long as there is a strong nexus between the intrastate and interstate activity. We so reasoned in Rybar, and will do the same here.

D.

In this case, we think that Congress could have rationally reasoned as follows: Some pornographers manufacture, possess, and use child pornography exclusively within the boundaries of a state, and often only within the boundaries of their own property. It is unrealistic to think that those pornographers will be content with their own supply, hence they will likely wish to explore new or additional pornographic photographs of children. Many of those pornographers will look to the interstate market as a source of new material, whether through mail order catalogs or through the Internet. Therefore, the possession of "homegrown" pornography may well stimulate a further interest in pornography that immediately or eventually animates demand for interstate pornography. It is also

18

reasonable to believe the related proposition that discouraging the intrastate possession of pornography will cause some of these child pornographers to leave the realm of child pornography completely, which in turn will reduce the interstate demand for pornography.5

Another way to describe the nexus between intrastate and interstate activity here is in terms of the notion of addiction, which is explicated in the legislative history accompanying the 1996 amendments to S 2252. 6 The Senate Report stated that

_____

5. Congress also reasonably could have believed that the clause at issue would affect the supply side of the child pornography market. Congress found that many producers of child pornography shipped their end product interstate. See S. Rep. No. 95-438, at ___ (1977), reprinted in 1978 U.S.C.C.A.N. 70, ___ (finding that child pornography had become a highly organized, multimillion dollar industry that operated on a nationwide scale and that the sale and distribution of such pornographic materials were carried on to a substantial extent through the mails and other instrumentalities of interstate commerce). Given that conclusion, Congress could have believed that before the 1990 amendments, commercial manufacturers of pornography were insufficiently deterred from making and then selling their products interstate, since the only stage at which their operation was illegal was at the selling stage. By making it illegal to possess pornography manufactured from materials that passed interstate, even when the pornography itself had not passed interstate, Congress made it easier for law enforcement officials to stem the flow of manufactured––but not yet distributed––pornography, thus curbing the supply of child pornography at its source, before it was released into the interstate market. While this rationale supports the purpose behind S 2252(a)(4)(B), we do not rely on it because such manufacturers are covered by another part of S 2252––to wit, S 2252(a)(3)(B), which makes it illegal knowingly to sell or to possess with
intent to sell child pornography that has passed in interstate commerce or that has been produced using materials that have traveled in interstate commerce. We mention this to illustrate that demand–side measures often have supply-side effects as well.

6. As we discussed supra n.4, we will consider legislative history relating
to S 2252, even if that history was not developed for the specific amendment to the statute at issue here. Though the use of subsequent legislative history is often disfavored as a method of determining an earlier Congress's legislative intent, see Chapman v. United States, 500 U.S. 453, 464 n.4 (1991), courts have occasionally found such legislative

19

> prohibiting the possession and viewing of child
> pornography will encourage the possessors of such
> material to rid themselves of or destroy the material,
> thereby helping to protect the victims of child
> pornography and to eliminate the market for the sexual
> exploitative use of children.

S. Rep. No. 104-358, at ___ (1996), reprinted at 1996 WL 506545. That report further explained the addictive nature of pornography: "[P]ornography `is an addiction that escalates, requiring more graphic or violent material for arousal.' . . . [T]he use of child pornography in time desensitizes the viewer . . . [and the user] escalates to more

_____

history useful. See Sykes v. Columbus & Greenville Ry., 117 F.3d 287, 293-94 (5th Cir. 1997) ("Although a committee report written with regard to a subsequent enactment is not legislative history with regard to a previously enacted statute, it is entitled to some consideration as a secondarily authoritative expression of expert opinion."); see also Strickland v. Commissioner, Maine Dep't of Human Servs., 48 F.3d 12, 18 (1st Cir. 1995) ("We conclude that the value, if any, of such post-enactment materials should be decided case by case."). Where, as here, Congress's subsequent fact-finding supplements, rather than conflicts with, its earlier statements; where we are not using later congressional statements as a way to interpret earlier language but rather as evidence of the kind of research the 1990 Congress had before it; and where the later fact-finding was made as part of an overall explanation of the purpose behind the statute rather than in reference to one particular subsection thereof, we think that subsequent fact-finding can be considered, though not given a large role, in the rational basis determination.

Even if we chose not to consider the subsequent history in our analysis of what facts Congress had before it in 1990, the subsequent history would be material for a quite different reason. To the extent that the 1996 legislative history sets out a rational explanation for why Congress might have believed that restricting intrastate pornography made from interstate materials would diminish the demand for interstate pornography, we may consider the statement not as subsequent legislative history but merely as evidence that there could be a rational basis for this belief. See Pic-A-State PA, Inc. v. Reno, 76 F.3d 1294, 1302 (3d Cir. 1996) (noting that in Commerce Clause challenges, the court's inquiry "must be restricted to the issue of whether any state of facts either known or which could reasonably be assumed affords support for it").

20

deviant material." Id. at ___ (noting also that "the existence of and traffic in child pornographic images . . . inflames the desires of . . . child pornographers who prey on children, thereby increasing the creation and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials").

We think that this common sense understanding of the demand-side forces we have described supra helps to demonstrate the strong nexus between the intrastate possession of and the interstate market in child pornography.7 We believe that this nexus provides a limiting principle of the type sought in Lopez , see 514 U.S. at 556-57, 564-65, for the nexus present here will not be present in criminal regulations that attempt to limit or ban behavior that does not involve an exchange of goods, such as murder or assault. This limit is particularly important in the criminal context, which is an area that traditionally has been regulated by the states. For these reasons, we

_____

7. See also United States v. Cardoza, 129 F.3d 6, 12 (1st Cir. 1997), decided in the context of the Youth Handgun Safety Act ("YHSA"), which prohibits the intrastate sale, transfer, delivery, and possession of handguns to and by juveniles, where the Court of Appeals noted:

> [W]e think the possessory prong of the YHSA . . . is `an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated.' This is so because the YHSA was designed expressly to `stop[ ] the commerce in handguns with juveniles nationwide. . . .'
> Part of this regulatory approach involves the suppression of the demand for such handguns. The YHSA can be thus seen as criminalization of the two points where the prohibited commerce finds its nexus; the demand for the firearms (possession), and the sale or transfer designed to meet that demand. The two prohibitions go hand in hand with one another. Invalidation of one half of the equation would likely have deleterious effects on the efficacy of the
> legislation.

(citations omitted) (alteration in original); see also United States v. Kenney, 91 F.3d 884, 890 (7th Cir. 1996) ("Permitting unregulated intrastate possessions and transfers of machine guns. . . indirectly undermines, via a market theory, the effectiveness of the federal attempt to regulate interstate commerce in machine guns.").

21

conclude that Congress rationally could have believed that child pornography that did not itself travel in interstate commerce has a substantial effect on interstate commerce, and is thus a valid subject of regulation under the Commerce Clause.

E.

We do not believe that the conclusion just reached supports the broad proposition that, since intrastate possession of a good so often has a substantial effect on the interstate market in the same good, Congress is effectively entitled to regulate any intrastate activity involving a good when there is a larger interstate market for it. The presence of two additional factors limits our holding. First, because the problem of child pornography is one that has been addressed by federal statutes for over twenty years, S 2252(a)(4)(B) does not constitute a "sharp break" in the pattern of federal legislation of the kind that troubled the Court in Lopez. See 514 U.S. at 563.

In addition, as we demonstrate below the subsection of S 2252(a)(4)(B) at issue here, which serves to close a loophole left open by the original statute, plays a critical role in maintaining the effectiveness of the overall statutory scheme, a factor that was absent in Lopez. See Lopez, 514 U.S. at 561 (noting that "S 922(q) is not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated"); see also Pic-A-State, 76 F.3d at 1302-03 (holding that Congress could have concluded that the [Interstate Wage] amendment at issue was necessary to effectuate the purposes of the original act, since the amendment closed an unforeseen loophole in that act). In the case of child pornography, Congress has long regulated interstate commerce in child pornography as a way to abolish child pornography entirely, and the subsection of the statute at issue here was added in 1990 because the effectiveness of that regulatory scheme was being undercut by the child pornographers who continued to manufacture their own pornography intrastate.

Specifically, it may be difficult to ascertain whether pornography found in an individual's home was produced

22

by that individual, acquired from a friend intrastate, or purchased in interstate commerce. Like controlled substances, and unlike weapons that carry identifying numbers, pornography may often be fungible. To the extent that one piece of child pornography is fungible with another, federal efforts to arrest users of pornography will be hindered by an inability to determine whether a particular piece of pornography has traveled interstate or not. That is, child pornography cannot be effectively regulated without federal control over both the interstate and local versions of the activity. In our view, this loophole–closing purpose illuminates and supports the congressional perception of the probable effect of intrastate pornography possession on the demand for interstate child pornography. However, before finalizing our conclusions on the issue, we must address Rodia's argument that intrastate possession of pornography is a non-commercial activity.

F.

In support of his argument that S 2252 is unconstitutional, Rodia points out that several pieces of the statute's legislative history acknowledge that most child pornographers do not possess pornography for commercial purposes, and that, as with the GFSZA invalidated in Lopez, Congress therefore is attempting to regulate an activity that has no relation to commerce.

First, he invokes the 1984 amendments to the statute, which, in the wake of the Supreme Court's decision in New York v. Ferber, 458 U.S. 747 (1982) (holding that child pornography is entitled to no First Amendment protection), eliminated the requirement that the child pornography have been created "for the purpose of sale or distribution for sale." The House Report noted:

> Many of the individuals who distribute materials covered by 18 U.S.C. 2252 do so by gift or exchange without any commercial motive and thus remain outside the coverage of this provision. . . . Since the harm to the child exists whether or not those who initiate or carry out the schemes are motivated by profit, the subcommittee found a need to expand the

23

coverage of the act by deleting the commercial purpose requirement.

H.R. Rep. No. 98-536, ___ (1983), reprinted in 1984 U.S.C.C.A.N. 492, ___. Second, the 1986 legislative history detailed that this change was made because "experience revealed that much if not most child pornography material is distributed through an underground network of pedophiles who exchange the material on a non-commercial basis." H.R. Rep. No. 99-910, at ___ (1986), reprinted in 1986 U.S.C.C.A.N. 5952, ____. Third, the Justice Department comments included in House Report 536 state:

> Utilization of 18 U.S.C. 2252 has been inhibited by the fact that the statute covers the distribution of child pornography only for commercial purposes. It is a fact, however, that many, perhaps even most, of the individuals who distribute materials covered by 18 U.S.C. 2252 do so by trade or exchange, without any commercial purpose and thereby avoid violating this provision. . . . Nevertheless, the harm to children involved in child pornography schemes exists whether or not those who initiate or carry out these schemes have a profit motive or commercial purpose.

H.R. Rep. No. 98-536, at ___ (1983), reprinted in 1984 U.S.C.C.A.N. at 502.

These findings illustrate that not all child pornographers produce pornography with the intent that it enter the stream of commerce. Nevertheless, such congressional findings do not foreclose a conclusion that intrastate possession of pornography affects interstate commerce. Congress's findings that some child pornography is noncommercial do not undermine its findings that child pornography is a multimillion dollar, nationwide industry. Rather, the former findings merely highlight that many people participate in the industry, and that a large number of those involved are independent operators who create child pornography for their own use and, perhaps, the use of their acquaintances. Where, as here, a class of activities is regulated (the shipment or exchange of child pornography) and the class is within the reach of federal power, we cannot rely on the fact that some of the class is

24

engaged in non-commercial activity to invalidate the entire statute. See Perez v. United States, 402 U.S. 146, 154 (1971) (noting that where Congress is appropriately regulating a class of activities, the courts have no power to excise, as trivial, individual instances of the class).

Moreover, as we noted in Bishop, Congress is not foreclosed from regulating an activity with links to interstate commerce even though some people engaging in that activity may not have a commercial motive. In Bishop, we explained, "While the [Department of Justice] report notes that economic gain is not the only or even the principal motive behind carjacking, the fact that additional motives exist is not relevant to our inquiry." 66 F.3d at 582 n.18. Indeed, Wickard embodies this principle since the wheat at issue there had been grown for personal consumption, not for sale; as discussed above, the Court upheld the statute, finding the intent of the wheat grower irrelevant. See 317 U.S. at 118 (upholding the statute even though it extended federal regulation "to [wheat] production not intended in any part for commerce but wholly for consumption on the farm"). More recently, in discussing what "affects interstate commerce" means in the RICO context, the Court noted, "An enterprise surely can have a detrimental influence on interstate or foreign commerce without having its own profit-seeking motives." National Org. for Women, Inc. v. Scheidler, 510 U.S. 249, 258 (1994).

Finally, many cases from this and other courts of appeals have made clear that the specific activity that Congress is regulating need not itself be objectively commercial, as long as it has a substantial effect on commerce. See Bishop, 66 F.3d at 581 (noting that Congress could have believed that it had to regulate carjacking, "whether or not it was strictly `commercial' or `economic,' " as one aspect of its response to the national commercial problem of criminal auto theft); see also National Ass'n of Home Builders v. Babbitt, 130 F.3d 1041, 1049 (D.C. Cir. 1997) ("A class of activities can substantially affect interstate commerce regardless of whether the activity at issue--in this case the taking of endangered species--is commercial or noncommercial."), cert. denied, 118 S. Ct. 2340 (1998); United States v. Bongiorno, 106 F.3d 1027, 1031 (1st Cir. 1997) (noting that

25

the Court consistently has interpreted the Commerce Clause "to include transactions that might strike a lay person as `noncommercial' ").

Therefore, the fact that a substantial portion of child pornographers possess pornography for non-commercial purposes does not automatically place the activity outside the realm of congressional regulation, especially since the activity has an obvious commercial element as well.

V. Rationality of the Means-Ends Connection

The final step in our inquiry is to determine whether the means chosen by Congress are reasonably adapted to the ends permitted by the Constitution. See Hodel, 452 U.S. at 276. We believe that there is a rational connection between the regulatory means (punishing the intrastate possession of child pornography) and the asserted ends (prohibiting interstate commerce in child pornography and reducing the inevitable harm to children that stems from their involvement in child pornography). See, e.g., United States v. Franklyn, 157 F.3d 90, 96 (2d Cir. 1998) (finding that prohibiting possession of machine guns was reasonable means of freezing, and ultimately eliminating, the largely interstate market for them); United States v. Cardoza, 129 F.3d 6, 12 (1st Cir. 1997) (finding that Congress's decision to punish both the supply (sale or transfer) and demand (possession) sides of the handgun market was a means reasonably calculated to achieve its end).

This is so even though Congress's means were not crafted with ultimate precision. Before S 2252 was amended to include the subsection at issue here, it was costly for pornographers to traffic in pornography across state lines, though it was costless (at least under federal law) to manufacture and use pornography intrastate. Section 2252(a)(4)(B) made it as costly to engage in the latter activity as in the former. Congress's amendment thus would likely have had two effects. First, some pornographers would decide that the costs of continuing to make and possess child pornography were too high, and those pornographers would leave the industry entirely--a result Congress clearly intended. Second, a reasonable

26

pornographer might conclude that, after the enactment of
S 2252(a)(4)(B), he had no incentive to continue to act
purely intrastate, since he was committing a crime whether
he made or used pornography that had passed interstate or
that had remained intrastate. Thus, some "homegrown"
pornographers might have turned to the interstate market,
increasing the interstate demand for child pornography.

We are troubled by the lack of express Congressional
findings about the effect of intrastate possession of child
pornography on interstate commerce. We acknowledge,
however, that

> [o]ur ability to imagine ways of redesigning the statute
> to advance one of Congress' ends does not render it
> irrational. . . . The history of congressional attempts to
> address the problem . . . provides sufficient reason to
> defer to the legislative judgment that [the statute in
> question] is an appropriate answer.

Preseault v. Interstate Commerce Comm'n, 494 U.S. 1, 19
(1990) (quoting Minnesota v. Clover Leaf Creamery Co., 449
U.S. 456, 469 (1981)). More importantly, we are satisfied--
in view of the teachings of Wickard's progeny, buttressed by
the fact that Congress has long legislated in this area and
was conscious of the need to close a loophole in a statute
governing interstate commerce--that S 2252(a)(4)(B) was a
reasonable exercise of Congress's power under the
Commerce Clause. The judgment of the District Court will
be affirmed.

27

ROTH, Circuit Judge, concurring:

I write separately because, although I agree with the majority that we should affirm Rodia's conviction, I do not agree with the separate analysis which the majority gives (1) to the jurisdictional element in Part III of its opinion and (2) to the effect of child pornography on interstate commerce in Part IV. I believe that both issues should be considered together. Their interrelationship is helpful in determining the constitutionality of the statute.

I do accept the majority's conclusion that the fact that a statute has a jurisdictional element may not be sufficient in and of itself to establish the statute's constitutionality. When, however, we are presented with a statute, such as the present one, which has been repeatedly held to cover conduct that affects interstate commerce, we must keep the previous history in mind when we examine the jurisdictional element of an amendment to the statute.

We are not in the present case plowing new ground, as was the situation in United States v. Lopez, 514 U.S. 549, 563 (1995), where there were no congressional findings that the possession of guns in a school zone substantially affected interstate commerce. Id. Here, we do have legislative findings to aid judicial evaluation of the effect of child pornography on interstate commerce. Cf. United States v. Rybar, 103 F.3d 273, 279 (3d Cir. 1996) (determining that "there are legislative findings to aid judicial evaluation of the effect of machine guns on interstate commerce.")

As the majority points out in Part IV, legislative history concerning predecessor and successor child pornography statutes supports the reasonableness of Congress's determination that a nexus exists between child pornography and interstate commerce. Because we have such a history, the jurisdictional element of S 2252(a)(4)(B) should be examined with that history in mind. These legislative findings are relevant not only to the majority's analysis in Part IV of the effect of child pornography on interstate commerce. They are also relevant to the evaluation of the jurisdictional element in Part III because that jurisdictional element is directed at the same evil as

28

the other provisions of the statute -- interstate trafficking in child pornography. I would defer to Congress's judgment that the regulation of materials, such as blank Polaroid film,[1] that have been in the stream of interstate commerce, is integral to its ability to regulate the interstate trafficking in child pornography -- even in an instance when thatfilm is used to create child pornography that is possessed intrastate.

For the above reasons, in the context of the present case, I do not agree with the statement of the majority that "[a] jurisdictional element is only sufficient to ensure a statute's constitutionality when the element either limits the regulation to interstate activity or ensures that the intrastate activity to be regulated falls within one of the three categories of congressional power. Slip Op. at 11." I believe the above statement is too limited. We cannot examine the jurisdictional element in isolation. An additional factor in the analysis of whether the jurisdiction element limits the regulation to interstate activity must be the nature of the underlying activity, here child pornography, and prior determinations of the effect that the activity in question has on interstate commerce.

As I have described above, I believe that the jurisdictional element here does limit the regulation to activity affecting interstate commerce because legislative findings have established the connection between child pornography and interstate commerce; the further requirement that the material on which the pornography was produced have

_____

1. The essential components of child pornography are film and video. Without these basic components, pornographic images of children-- which even Rodia concedes Congress may regulate under the Commerce Clause if transported interstate--could not be created. Moreover, instant film, such as the Polaroid film at issue in this case, is particularly important to both possessors and manufacturers of pornography; commercial processing of pornographic images places the creator of the pornography in great jeopardy of being reported to authorities by commercial developers. Thus, while Polaroid film may seem a relatively odd commodity for the federal government to regulate, the onus for this anomaly lies upon those who manufacture and possess child pornography.

moved in interstate commerce will be proved on a case by case basis.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

30