**PUBLISH**

## UNITED STATES COURT OF APPEALS
## TENTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellant,

v.

    No. 04-4137

VIRGILIO JERONIMO-BAUTISTA,
also known as Virgilino Jeronimo,

    Defendant-Appellee.

---

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:04-CR-81-TS)**

---

Michael S. Lee, Assistant United States Attorney (Paul M. Warner, United States Attorney, and Karin M. Fojtik, Assistant United States Attorney, with him on the briefs), Salt Lake City, Utah, for Plaintiff-Appellant.

Mary C. Corporon, Corporon & Williams, P.C., Salt Lake City, Utah, for Defendant-Appellee.

---

Before **SEYMOUR**, **PORFILIO** and **EBEL**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

Virgilio Jeronimo-Bautista was indicted, in part, for coercing a minor to engage in sexually explicit conduct "for the purpose of producing visual depictions of such conduct . . . using materials that have been . . . transported in interstate and foreign commerce," in violation of 18 U.S.C. § 2251(a). The district court dismissed the charge, concluding that as applied to Mr. Jeronimo-Bautista, § 2251(a) exceeded Congress' authority under the Commerce Clause. *United States v. Jeronimo-Bautista*, 319 F. Supp. 2d 1272 (D. Utah 2004). The government appeals, and we reverse.

# I

This case arises out of Mr. Jeronimo-Bautista's motion pursuant to FED. R. CRIM. P. 12(b)(3)(B), in which he sought the dismissal of his indictment. He contended the district court lacked subject matter jurisdiction over the crime charged against him because the acts he allegedly committed "did not constitute any conduct impacting interstate commerce, or any subject or matter properly within the purview of the federal government." App. at 13. While Mr. Jeronimo-Bautista asserts he is actually innocent, for the purposes of our review of the district court's grant of Mr. Jeronimo-Bautista's Rule 12(b)(3)(B) motion we make all factual inferences in favor of the government, assuming it could prove the facts alleged against Mr. Jeronimo-Bautista at a trial. *See United States v.*

*Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994) (citing *United States v. Sampson*, 371 U.S. 75, 78-79 (1962)) (allegations in indictment are treated as true when reviewing Rule 12(b) motion to dismiss). Accordingly, for the purposes of this appeal only, we assume the following facts.

On January 29, 2004, Mr. Jeronimo-Bautista and two other men, while in the company of a thirteen year-old girl, entered a vacant residence in Magna, Utah. At some point the girl became unconscious, possibly after ingesting an intoxicating substance. After she lost consciousness, the three men removed her clothing, sexually assaulted her, and took photographs of their actions. The camera used to take the photographs was not manufactured in the state of Utah.

One of the men took the film to a one-hour photo lab for processing. In the course of developing the film, staff at the lab noticed images that appeared to depict the sexual assault of a minor female. The manager of the lab called the police, who viewed the photographs and then initiated an investigation resulting in the arrest and indictment of Mr. Jeronimo-Bautista. As noted by the district court, it was undisputed that Mr. Jeronimo-Bautista was a citizen of Mexico and resided in the State of Utah. *Jeronimo-Bautista*, 319 F. Supp. 2d at 1274. The victim was born in Utah and was not transported across state lines in connection with the acts charged in the indictment. *Id.* Moreover, "[t]he photos were never disseminated, were not stored or transmitted electronically via the Internet, the

-3-

United States Postal Service, nor by any other method across state lines or internationally. There is no indication that [Mr. Jeronimo-Bautista] had any intention of so transmitting or storing the images." *Id.*

The indictment charged that Mr. Jeronimo-Bautista, along with the two other men[1]

> did knowingly employ, use, persuade, induce, entice, and coerce a minor . . . to engage in sexually explicit conduct for the purpose of producing visual depictions of such conduct, which visual depictions were produced using materials that have been mailed, shipped, and transported in interstate and foreign commerce, and did aid and abet each other therein,

app. at 11-12, thereby violating § 2251(a) (production of child pornography)[2] and 18 U.S.C. § 2 (aiding and abetting). Mr. Jeronimo-Bautista moved to dismiss the indictment on the ground that the district court did not have subject matter

---

[1]Mr. Jeronimo-Bautista's co-defendants are not parties to this appeal.

[2]18 U.S.C. § 2251(a) reads in full:
Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, shall be punished as provided under [this statute], if such person knows or has reason to know that such visual depiction will be transported in interstate or foreign commerce or mailed, if that visual depiction was produced using materials that have been mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported in interstate or foreign commerce or mailed.

jurisdiction over the acts charged against him, contending § 2251(a) violated the Commerce Clause as applied to him. The district court agreed, concluding that Mr. Jeronimo-Bautista's charged activity "was not of a type demonstrated to be *substantially* connected or related to interstate commerce." *Jeronimo-Bautista*, 319 F. Supp. 2d at 1282. This case is now before us on the government's appeal.

## II

We review "challenges to the constitutionality of a statute *de novo*." *United States v. Dorris*, 236 F.3d 582, 584 (10th Cir. 2000). The United States Constitution grants to Congress the "Power to . . . regulate Commerce . . . among the several States." U.S. CONST. art I, § 8, cl. 3. As relevant here, "Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, *i.e.*, those activities that substantially affect interstate commerce." *United States v. Lopez*, 514 U.S. 549, 558-59 (1995) (internal citations omitted). Hence we must determine whether Mr. Jeronimo-Bautista's local production of pornographic images of a child substantially affects interstate commerce.

In addressing Mr. Jeronimo-Bautista's as applied challenge to the statute, the district court noted the four factors delineated by the Supreme Court in *United States v. Morrison*, 529 U.S. 598 (2000), and in *Lopez* "for consideration in

addressing the constitutionality of a statute based upon Commerce Clause authority." *Jeronimo-Bautista*, 319 F. Supp. 2d at 1278. The court accurately described those factors as (1) whether the prohibited activity is commercial or economic in nature; (2) whether the statute's reach was limited by an express jurisdictional element; (3) whether Congress made findings about the effects of the prohibited conduct on interstate commerce; and (4), whether there exists a link between the prohibited conduct and the effect on interstate commerce. *Id.*

Working its way through the *Lopez/Morrison* factors, the district court first rejected the argument that Mr. Jeronimo-Bautista's activity was economic in nature and, in doing so, rejected the assertion that Mr. Jeronimo-Bautista's intrastate activities could, in the aggregate, affect interstate commerce. *Id.* Second, the court determined § 2251(a)'s express jurisdictional element failed "to place any meaningful restrictions on federal jurisdiction and fail[ed] to establish the link between the violation and interstate commerce." *Id.* at 1280. Third, the court was not convinced the existence of Congressional findings regarding the child pornography industry was "sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation as applied to the facts of this case." *Id.* (internal quotation omitted). Finally, referring back to its determination that Mr. Jeronimo-Bautista's activity could not be deemed economic in nature, the court also rejected the use of an aggregation theory to

support the argument that there existed something more than only a tenuous link between Mr. Jeronimo-Bautista's prohibited activity and interstate commerce. *Id.* at 1281. The court dismissed the indictment against Mr. Jeronimo-Bautista on the grounds that as applied to the specific facts of his case, § 2251(a) violated the Commerce Clause.

Pending this appeal, the Supreme Court decided *Gonzales v. Raich*, 125 S. Ct. 2195 (2005), in which it rejected an as applied challenge to the Controlled Substances Act (CSA), 21 U.S.C. § 801 *et seq.*, and held that Congress could regulate the purely local production, possession, and use of marijuana for personal medical purposes. *Raich*, 125 S. Ct. at 2215. As we discuss in more detail below, the Court's reasoning in *Raich*, coupled with the standard four factor *Lopez/Morrison* analysis, supports our conclusion that the district court erred in concluding § 2251(a) violates the Commerce Clause as applied to Mr. Jeronimo-Bautista.

We begin by examining the findings accompanying the comprehensive scheme developed by Congress to eliminate the production, possession, and dissemination of child pornography. When Congress first passed the Protection of Children Against Sexual Exploitation Act of 1977, it noted "that child pornography . . . [has] become [a] highly organized, multimillion dollar industr[y] that operate[s] on a nationwide scale . . . [and that] the sale and distribution of

such pornographic materials are carried on to a substantial extent through the mails and other instrumentalities of interstate and foreign commerce." S. REP. NO. 95-438, at 5 (1977), *reprinted in* 1978 U.S.C.C.A.N. 40, 42-43.[3] Findings supporting the 1977 Act also noted that

> [s]ince the production, distribution and sale of child pornography is often a clandestine operation, it is extremely difficult to determine its full extent. At present, however, a wide variety of child pornography is available in most areas of the country. Moreover, because of the vast potential profits involved, it would appear that this sordid enterprise is growing at a rapid rate.

*Id.* at 43.

Amendments to the Act in 1984 eliminated the requirement that "the production, receipt, transportation, or distribution of child pornography be for a 'pecuniary profit.'" *United States v. Morales-de Jesus*, 372 F.3d 6, 11 (1st Cir. 2004). The purpose of this amendment was to eliminate an enforcement gap in the statute: "Many of the individuals who distribute materials covered [by the statute] do so by gift or exchange without any commercial motive and thus remain outside the coverage of this provision." H.R. REP. NO. 98-536, at 2 (1983),

---

[3]Although we are specifically reviewing a portion of the child pornography statutes as amended in 1998, congressional findings and the legislative history supporting the statutes enacted in 1977, as well as subsequent amendments up to 1998, are relevant to our inquiry. *See Maryland v. Wirtz*, 392 U.S. 183, 190 n.13 (1968) (noting that when Congress enacts related legislation accompanied by relevant findings, subsequent legislation is "presumably based on similar findings and purposes with respect to the areas newly covered"), *overruled on other grounds by Nat'l League of Cities v. Usery*, 426 U.S. 833 (1976).

*reprinted in* 1984 U.S.C.C.A.N. 492, 493; *see also* H.R. REP. NO. 99-910, at 4 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5952, 5954 (1984 amendments sought to "eliminate the requirement that interstate distribution be for the purpose of sale; experience revealed that much if not most child pornography material is distributed through an underground network of pedophiles who exchange the material on a non-commercial basis, thus no sale is involved"). Likewise, in 1984, in support of § 2251, Congress echoed its findings supporting the original 1977 legislation, stating in part that "child pornography has developed into a highly organized, multi-million-dollar industry which operates on a nationwide scale." H.R. 3635, 98th Cong. (2nd Sess. 1984); *see also* H.J. Res. 738, 99th Cong., 100 Stat. 1783 (1986) ("child exploitation has become a multi-million dollar industry, infiltrated and operated by elements of organized crime, and by a nationwide network of individuals openly advertising their desire to exploit children").

In 1996, Congress further amended the Act regarding the electronic creation of child pornography. *See Morales-de Jesus*, 372 F.3d at 11. The findings supporting those amendments noted that "the existence of . . . child pornographic images . . . inflames the desires of child molesters, pedophiles, and child pornographers who prey on children, thereby increasing the creation and distribution of child pornography . . . ." S. REP. NO. 104-358, at 2 (1996),

*available at* 1996 WL 506545. Congress also stated that "prohibiting the possession and viewing of child pornography will encourage the possessors of such material to rid themselves of or destroy the material, thereby helping to protect the victims of child pornography and to eliminate the market for the sexual exploitative use of children . . . ." *Id.* at 3. Finally, in a 1998 amendment to the Act, a jurisdictional element was added to cover child pornography created "using materials that have been mailed, shipped, or transported in interstate or foreign commerce by any means." § 2251(a). This addition reflected Congress' concern "about federal law enforcement's current inability to prosecute 'a number of cases where the defendant produced the child pornography but did not intend to transport the images in interstate commerce." *Morales-de Jesus*, 372 F.3d at 12 (quoting H.R. REP. NO. 105-557, at 27 (1998), *reprinted in* 1998 U.S.C.C.A.N. 678, 695).

In reviewing this history, we acknowledge that Congress may not have engaged in specific fact finding regarding how the intrastate production of child pornography substantially affects the larger interstate pornography market. But the Supreme Court noted in *Raich*, 125 S. Ct. at 2208, that it has "never required Congress to make particularized findings in order to legislate." Moreover, we agree with our colleagues on the First Circuit that Congress' explicit findings regarding the "extensive national market in child pornography and the need to

diminish that national market" support the contention that "prohibiting the production of child pornography at the local level" helps to further the Congressional goal. *Morales-de Jesus*, 372 F.3d at 12; *see also United States v. Adams*, 343 F.3d 1024, 1031-32 (9th Cir. 2003) (outlining legislative history of child pornography statutes in rejection of Commerce Clause challenge); *United States v. Holston*, 343 F.3d 83, 85-86 (2d Cir. 2003) (same); *United States v. Buculei*, 262 F.3d 322, 329 (4th Cir. 2001) (same); *United States v. Kallestad*, 236 F.3d 225, 229 (5th Cir. 2000) (same); *United States v. Rodia*, 194 F.3d 465, 474-75 (3d Cir. 1999) (same).

The decision in *Raich* also supports the conclusion that Mr. Jeronimo-Bautista's production of the images in this case is economic in nature. "Economics refers to the production, distribution, and consumption of commodities." *Raich*, 125 S. Ct. at 2211 (internal quotations omitted). The Court held that the Controlled Substances Act "is a statute that regulates the production, distribution, and consumption of commodities for which there is an established, and lucrative, interstate market. Prohibiting the intrastate possession or manufacture of an article of commerce is a rational (and commonly utilized) means of regulating commerce in that product." *Id.* The same reasoning is applicable to the intrastate production of child pornography. Like the CSA, the child pornography statutes regulate the "production, distribution, and

consumption of commodities for which there is an established, and lucrative, interstate market." *Id.* Congress' prohibition against the intrastate possession or manufacture of child pornography "is a rational (and commonly utilized) means of regulating commerce in that product." *Id.*; *see also Morales-de Jesus*, 372 F.3d at 12 (Congress' initial finding in 1977 that child pornography is a "'multimillion dollar industry that operates on a nationwide scale' emphasizes that the underlying activity regulated by the child pornography statutes – the production, distribution, and possession of child pornography – is commercial activity . . . ."); *Holston*, 343 F.3d at 88 (finding activity covered by § 2251 economic in nature); *Buculei*, 262 F.3d at 329 (same); *Kallestad*, 236 F.3d at 228 (same regarding § 2252); *Rodia*, 194 F.3d at 480-81 (same).

In holding that a sufficient link existed between the local production and use of marijuana and its effect on interstate commerce, the Court in *Raich* relied extensively on *Wickard v. Filburn*, 317 U.S. 111 (1942). In *Wickard*, the Court upheld the Agriculture Adjustment Act of 1938, 52 Stat. 31, which permitted congressional regulation of a farmer's wholly intrastate production and consumption of wheat on his farm. *Id.* at 127-29. *Wickard* "establishes that Congress can regulate purely intrastate activity that is not itself 'commercial,' in that it is not produced for sale, if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that

commodity." *Raich*, 125 S. Ct. at 2006. The Court noted that

> [i]n *Wickard*, we had no difficulty concluding that Congress had a
> rational basis for believing that, when viewed in the aggregate,
> leaving home-consumed wheat outside the regulatory scheme would
> have a substantial influence on price and market conditions. Here
> too, Congress had a rational basis for concluding that leaving home-
> consumed marijuana outside federal control would similarly affect
> price and market conditions.

*Id.* at 2207. It viewed its task as not to determine "whether respondents'
activities, taken in the aggregate, substantially affect interstate commerce *in fact*,
but only whether a 'rational basis' exists for so concluding." *Id.* at 2208 (quoting
*Lopez*, 514 U.S. at 557) (emphasis added).

Dismissing arguments that regulation of locally cultivated and possessed
marijuana was beyond the "outer limits" of Congress' Commerce Clause
authority, *id.* at 2212, the Court observed:

> [o]ne need not have a degree in economics to understand why a
> nationwide exemption for the vast quantity of marijuana (or other
> drugs) locally cultivated for personal use (which presumably would
> include use by friends, neighbors, and family members) may have a
> substantial impact on the interstate market for this extraordinarily
> popular substance. The congressional judgment that an exemption
> for such a significant segment of the total market would undermine
> the orderly enforcement of the entire regulatory scheme is entitled to
> a strong presumption of validity. Indeed, that judgment is not only
> rational, but "visible to the naked eye," *Lopez*, 514 U.S. at 563, 115
> S.Ct. 1624, under any commonsense appraisal of the probable
> consequences of such an open-ended exemption.

*Id.* Finally, noting the "findings in the CSA and the undisputed magnitude of the
commercial market for marijuana, [the] decisions in *Wickard v. Filburn* and the

-13-

later cases endorsing its reasoning," the Court concluded Congress could regulate the "intrastate, noncommercial cultivation, possession and use of marijuana." *Id.* at 2215.

This reasoning applies to the child pornography statute at issue here. Under the aggregation theory espoused in *Wickard* and in *Raich*, the intrastate production of child pornography could, in the aggregate, have a substantial effect on the interstate market for such materials. In *Raich*, the respondents were "cultivating, for home consumption, a fungible commodity for which there [was] an established, albeit illegal, interstate market." *Id.* at 2206. Child pornography is equally fungible and there is no question an established market exists for its sale and exchange. The Court in *Raich* reasoned that where there is a high demand in the interstate market for a product, the exemption from regulation of materials produced intrastate "tends to frustrate the federal interest in eliminating commercial transactions in the interstate market in their entirety." *Id.* at 2207. For the same reasons, § 2251(a) "is squarely within Congress' commerce power because production of the commodity meant for home consumption, be it wheat . . . , marijuana [or child pornography], has a substantial effect on supply and demand in the national market for the commodity." *Id.* at 2207.

In this regard, we agree with the Second Circuit's rejection of a Commerce Clause challenge to § 2251(a), in which the court anticipated the analysis

subsequently laid out in *Raich*. *See Holston*, 343 F.3d at 90-91.  There, the court

held that

> when Congress regulates a class of activities that substantially affect
> interstate commerce, the fact that certain intrastate activities . . . may
> not actually have a significant effect on interstate commerce is . . .
> irrelevant.  Moreover, the nexus to interstate commerce . . . is
> determined by the class of activities regulated by the statute as a
> whole, not by the simple act for which an individual defendant is
> convicted.  Where, as here, a general regulatory statute bears a
> substantial relation to commerce, the *de minimis* character of
> individual instances arising under that statute is of no consequence.

*id.* (internal quotations and citations omitted).  Similarly, in *Morales-de Jesus*,

372 F.3d at 14-17, the First Circuit succinctly articulated how the intrastate

production of child pornography could substantially impact interstate commerce

under a *Wickard* aggregation analysis.  The court noted that

> producing child pornography fuels the supply side of the market . . . :
> by outlawing the purely local production of child pornography,
> Congress can curb the nationwide supply for these materials.  The
> prohibition on intrastate production curbs the supply of child
> pornography at its source, before it is released into the interstate
> market. . . .  Often, as is the case here, it is necessary to control local
> behavior to ensure the effectiveness of interstate regulation.

*Id.* at 16-17.[4]

---

[4]Section 2251(a) includes a jurisdictional element as required by the
*Lopez/Morrison* factors.  While other courts have questioned the sufficiency of §
2251(a)'s jurisdictional element, *see Morales-de Jesus*, 372 F.3d at 13-14;
*Holston*, 343 F.3d at 88-89; *Rodia*, 194 F.3d at 471-74, we need not linger on this
issue.  In light of the Supreme Court's ruling in *Raich*, and our conclusion that the
activity regulated in this case has a substantial impact on interstate commerce, any
(continued...)

Mr. Jeronimo-Bautista is challenging the statute's constitutionality as applied to him. The Court in *Raich* held the plaintiffs' as applied challenges to the CSA failed because the Court had

> no difficulty concluding that Congress acted rationally in determining that [the intrastate, noncommercial, cultivation, possession, and use of marijuana for personal medical uses], whether viewed individually or in the aggregate, [did not] compel[] an exemption from the CSA; rather, th[is] subdivided class of activities . . . was an essential part of the larger regulatory scheme.

*Id.* at 2211. So too in Mr. Jeronimo-Bautista's case. Congress' decision to deem illegal Mr. Jeronimo-Bautista's local production of child pornography represents a rational determination that such local activities constitute an essential part of the interstate market for child pornography that is well within Congress' power to regulate.

Concluding that § 2251(a), as applied to Mr. Jeronimo-Bautista, is a legitimate exercise of Congress' regulatory powers under the Commerce Clause,[5]

---

[4](...continued)
"failure of the jurisdictional element effectively to limit the reach of the statute is not determinative." *Holston*, 343 F.3d at 89.

[5]In so doing, we join a number of circuits, who, prior to the Supreme Court's decision in *Gonzales v. Raich*, 125 S. Ct. 2195 (2005), rejected, under varying theories, as applied and facial challenges to the child pornography possession and production statutes. *See United States v. Morales-de Jesus*, 372 F.3d 6 (1st Cir. 2004) (rejecting facial and as applied challenges to § 2251(a)); *United States v. Adams*, 343 F.3d 1024 (9th Cir. 2003) (rejecting facial challenge to § 2252(a)(4)(B)); *United States v. Holston*, 343 F.3d 83 (2d Cir. 2003)

(continued...)

we **REVERSE** the district court and **REMAND** for further proceedings.

---

[5](...continued)
(rejecting facial and as applied challenges to § 2251(a)); *United States v. Buculei*, 262 F.3d 322 (4th Cir. 2001) (rejecting as applied challenge to § 2251(a)); *United States v. Hampton*, 260 F.3d 832 (8th Cir. 2001) (rejecting facial challenge to § 2251(a) and § 2252(a)(4)(B)); *United States v. Galo*, 239 F.3d 572 (3d Cir. 2001) (rejecting facial and as applied challenge to § 2251(a) and § 2252(a)(4)(B)); *United States v. Kallestad*, 236 F.3d 225 (5th Cir. 2000) (rejecting facial challenge to § 2252(a)); *United States v. Angle*, 234 F.3d 326 (7th Cir. 2000) (rejecting facial challenge to § 2252(a)(4)(B)). Recently, in *United States v. Riccardi*, 405 F.3d 852 (10th Cir. 2005), our circuit rejected an as applied challenge to § 2252(a)(4)(B). *But see United States v. Smith*, 402 F.3d 1303 (11th Cir.) (finding § 2251(a) and § 2252(a)(5)(B) unconstitutional as applied), *vacated and remanded by* 125 S. Ct. 2938 (2005); *United States v. McCoy*, 323 F.3d 1114 (9th Cir. 2003) (same as to § 2252(a)(4)(B)); *United States v. Corp*, 236 F.3d 325 (6th Cir. 2001) (same).