**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**March 7, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

　　　Plaintiff-Appellee,

　　v.

BRENT LEE CROXFORD, a/k/a Brent
Croxford,

　　　Defendant-Appellant.

No. 04-4158

(D.C. No. 2:02-CR-00302 PGC)
(District of Utah)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE**, **PORFILIO**, Circuit Judges, and **BROWNING**, District Judge.[**]

Defendant-Appellant Brent Croxford appeals his sentence of 148 months for

coercing a minor to engage in sexually explicit conduct for the purpose of producing a

visual depiction of the conduct. Croxford raises two issues on appeal: (i) whether 18

U.S.C. § 2251(a) is facially unconstitutional or unconstitutional as applied;[1] and (ii)

---

[*] This Order and Judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

[**] The Honorable James O. Browning, United States District Judge for the District
of New Mexico, sitting by designation.

[1] Croxford also raises on appeal whether 18 U.S.C.§ 2252A(a)(5)(B) is facially
unconstitutional or unconstitutional as applied. We will not, however, discuss the
constitutionality of 18 U.S.C. § 2252A(a)(5)(B) -- Count II of the Indictment. Croxford

whether the district court committed constitutional error when it applied the Guidelines in an advisory manner and enhanced the Defendant's sentence based on judicially-found facts. Section 2251(a), which criminalizes the intrastate production of child pornography, is facially constitutional and constitutional as applied to Croxford's conduct. Because the statute's application to Croxford's conduct is constitutional, and the district court applied the Guidelines in an advisory rather than in a mandatory fashion, we affirm the conviction and the sentence.

---

pled to Count I, and the United States moved the district court to dismiss Count II. While the parties have continued to address the constitutionality of 18 U.S.C. § 2252A(a)(5)(B) in their briefs, the district court dismissed that charge. See e.g., United States v. Randolph, 364 F.3d 118, 119 n. 1 (3d Cir. 2004) (noting that, while the defendant appealed conviction for violating § 2251(a), he could not challenge § 2252(a)(4)(B), under which he was indicted but not convicted, because the United States later dismissed the count). Hence, we address only the "production" statute and not the "possession" statute.

## FACTUAL BACKGROUND[2]

In November 2001, "C.C.," a young girl, approximately eight or nine years old, disclosed to Lori Thomassen, a caseworker from the Utah Division of Children and Family Services, and Detective Craig Ellerston, with the South Jordan Police Department, that Croxford, her adoptive father, had taken nude photographs of her with a digital camera. C.C. described the sexually explicit poses that Croxford asked her to perform in the photographs. C.C. also stated that she believed Croxford put these photographs on the Internet and that he had taken similar photographs of another young girl who had been a foster child in the Croxford home.

Ellerston interviewed Croxford, who stated that he had taken "bathtub" photographs of C.C. Croxford also confirmed in the interview that he owned a Sony digital camera and was an Internet provider for certain customers. He also told Ellerston that he repaired and worked on computers in his home. At the conclusion of the interview, Croxford stated in reference to the sexually explicit pictures C.C. described: "I meant to delete all of those;" and "You should take me out and shoot me." Order Denying Motion to Dismiss at 2.

Based on this information, Ellerston obtained a search warrant for the Croxford home. During the warrant's execution, the officers discovered several computer diskettes

---

[2] The facts we recite in this section are taken from the district court's Order Denying Motion to Dismiss (filed July 2, 2004). The record provided by the parties does not contain the transcript of the hearing on Croxford's motion to dismiss or any other underlying evidence. The parties do not appear, however, to contest these facts.

in a file cabinet that contained sexually explicit pictures of C.C.  The officers also examined Croxford's computer equipment and discovered that he had downloaded thousands of pornographic images, including child pornography.  The computer equipment, the computer diskettes, and the Sony digital camera that the officers took from Croxford's home were manufactured outside of the state of Utah.  See id.

## PROCEDURAL BACKGROUND

A federal grand jury indicted Croxford on charges of production of child pornography and possession of child pornography based on C.C.'s testimony regarding the digital photographs and the images of C.C. found on the computer diskettes.  Count I of the indictment charged Croxford with coercing a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, which visual depiction was produced using materials that have been transported in interstate commerce, in violation of 18 U.S.C. § 2251(a).

Croxford filed a motion to dismiss, arguing that the conduct alleged in the indictment -- the intrastate production of child pornography -- was beyond Congress' authority to regulate under the Commerce Clause of Article I of the United States Constitution.  The district court denied the motion, concluding that the Commerce Clause gives Congress the power to enact the criminal statute under which the grand jury indicted Croxford.  See Order Denying Motion to Dismiss at 1.  Croxford subsequently pled guilty to Count I of the indictment.  He stipulated to the following facts:

Between on or about an unknown date and continuing through November

-4-

> 22, 2001, defendant took and possessed sexually explicit photographs of his adopted nine-year old daughter with his digital camera. The images were produced using materials, including the digital camera, computers, and computer diskettes, that were mailed, shipped, and transported in interstate commerce. The defendant's actions violated Title 18, United States Code, Section 2251.

Statement By Defendant in Advance of Plea of Guilty ¶ 12, at 4 (filed Feb. 25, 2004)(hereinafter "Statement in Advance of Plea"). The Statement in Advance of Plea also specified that Croxford retained his right to appeal the district court's order denying his motion to dismiss for lack of jurisdiction. See id. ¶ 13(3)(A), at 5.

Based on these stipulated facts and the presentence report's recommendation, Croxford faced a then-mandatory Sentencing Guideline range of 121-151 months. The Supreme Court of the United States decided Blakely v. Washington, 542 U.S. 296 (2004), shortly before the district court sentenced Croxford. At the sentencing, the district court applied Blakely to the Federal Sentencing Guidelines to hold that they violated the Fifth and Sixth Amendments. In so holding, the district court struck the Guidelines down as facially unconstitutional and unconstitutional as applied to Croxford. After striking down the Guidelines, the district court believed that it was free to examine all "relevant" information in determining Croxford's sentence. See United States v. Croxford, 324 F. Supp. 2d 1230, 1247-49 (D. Utah 2004). Predicting the Supreme Court's conclusion in United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005), that the Guidelines are advisory and not mandatory, the district court looked to the Guidelines as "useful instruction on the appropriate sentence." 324 F. Supp. 2d at 1248. The district court also

looked at Croxford's psychiatric history, the victim's vulnerability, and the offense's seriousness. Using the Guidelines as a guide, the district court then sentenced Croxford to a term of 148 months. See id. at 1248.

**LOPEZ, MORRISON, AND RAICH**

Under the Commerce Clause, Congress is authorized "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. This power is not limitless, however. See United States v. Lopez, 514 U.S. 549, 553 (1995). As the Supreme Court explained in Gonzales v. Raich, 545 U.S. ___, 125 S. Ct. 2195 (2005), there are "three general categories of regulation in which Congress is authorized to engage under its commerce power." Id. at 2205. Congress may regulate: (i) "the channels of interstate commerce;" (ii) "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities;" and (iii) "activities that substantially affect interstate commerce." United States v. Lopez, 514 U.S. at 558-59. See Gonzales v. Raich, 125 S. Ct. at 2205. In United States v. Lopez, the Supreme Court's decision whether gun possession in school zones substantially affected interstate commerce turned on four considerations. See 514 U.S. at 559-67. The Supreme Court considered: (i) whether the statute regulated economic activity; (ii) whether the statute contained an express jurisdictional element that might limit its reach; (iii) whether Congress made findings about the prohibited activity's effect on interstate commerce; and (iv) whether there was a substantial, non-attenuated link between the prohibited activity

and its effect on interstate commerce. See United States v. Morrison, 529 U.S. 598, 609-12 (2000).

Morrison clarified the "substantially affects" test and elaborated on the controlling four factors for determining whether a regulated activity substantially affects interstate commerce. First, a court must determine whether the challenged statute has anything to do with "commerce" or economic enterprise, however broadly one might define those terms. Second, a court must consider whether the statute contains an express jurisdictional element which might limit its reach to a discrete set of cases that have an explicit connection with or effect on interstate commerce. Third, any congressional findings regarding the regulated activity's impact on interstate commerce may inform the court's inquiry. Finally the court must consider whether the link between the regulated activity and a substantial effect on interstate commerce is attenuated. See Id. at 610-13.

In Gonzales v. Raich, 125 S. Ct. 2195, the Supreme Court did not explicitly refer to or use these four considerations to analyze the statute in that case. Justice Scalia, in his opinion concurring in the judgment, also did not expressly mention these four considerations. Without more express direction from the Supreme Court, however, we do not believe we should jettison the Lopez-Morrison framework when addressing the facial challenge. The Supreme Court in Gonzales v. Raich does not say that it is going that far. The absence of the Lopez-Morrison analysis in Gonzales v. Raich may be the result of the Supreme Court's self-described "modest" task in that case:

Respondents in this case do not dispute that passage of the [Controlled

Substances Act], as part of the Comprehensive Drug Abuse Prevention and Control Act, was well within Congress' commerce power. Nor do they contend that any provision or section of the CSA amounts to an unconstitutional exercise of congressional authority. Rather, respondents' challenge is actually quite limited; they argue that the CSA's categorical prohibition of the manufacture and possession of marijuana <u>as applied</u> to the intrastate manufacture and possession of marijuana for medical purposes pursuant to California law exceeds Congress' authority under the Commerce Clause.

<u>Gonzales v. Raich</u>, 125 S. Ct. at 2204-2205 (emphasis added)(citations omitted). In other words, <u>Gonzales v. Raich</u> dealt merely with an as-applied challenge, as opposed to a facial one, to the CSA under the commerce clause. We do not read <u>Gonzales v. Raich</u> to completely dispense with the <u>Lopez-Morrison</u> framework for addressing a facial challenge. Indeed, as the majority in <u>Gonzales v. Raich</u> explain, the two challenges are distinct and the distinction is pivotal:

As an initial matter, the statutory challenges at issue in [<u>Lopez</u> and <u>Morrison</u>] were markedly different from the challenge respondents pursue in the case at hand. Here, respondents ask us to excise individual applications of a conceded valid statutory scheme. In contrast, in both <u>Lopez</u> and <u>Morrison</u>, the parties asserted that a particular statute or provision fell outside Congress' commerce power in its entirety. This distinction is pivotal for we have often reiterated that "where the class of activities is regulated and that class is within the reach of federal power, the courts have no power 'to excise, as trivial, individual instances' of the class."

125 S. Ct. at 2209 (citations omitted). Without further guidance from the Supreme Court, we are hesitant to scrap the <u>Lopez-Morrison</u> approach employed by every circuit that has addressed facial challenges to § 2251(a) and analogous statutes under the Commerce Clause, and will still use the four <u>Lopez-Morrison</u> factors as a checklist in analyzing the

statute. The Court will, however, employ <u>Gonzales v. Raich</u> to address Croxford's as-applied challenge.

**DISCUSSION**

Here, as in <u>Lopez</u> and <u>Morrison</u>, Croxford asserts that § 2251(a), which criminalizes purely intrastate production of child pornography, falls outside Congress' commerce power in its entirety. Alternatively, he asserts that, even if § 2251(a) is within Congress' commerce power, it is unconstitutional as applied to him. Under the Supreme Court's analysis in <u>Lopez</u> and <u>Morrison</u>, the Court finds § 2251(a) constitutional. And because <u>Raich</u> controls our analysis of Croxford's as-applied challenge, the Court rejects such challenge.

**I.      <u>SECTION 2251(a) IS FACIALLY CONSTITUTIONAL</u>.**

We review "challenges to the constitutionality of a statute de novo." <u>United States v. Dorris</u>, 236 F.3d 582, 584 (10th Cir. 2000). The district court considered whether it could uphold the challenged statute under both the second and third categories, evaluating the statute's constitutionality under both a "things-in-commerce" and a "substantially affecting commerce" analysis. Order Denying Motion to Dismiss, at 6-13. Because we believe that this statute fits within the third category, the substantially affects test, and that we can uphold its constitutionality under the four <u>Lopez-Morrison</u> factors for that category, we need not and will not address the statute's constitutionality under the second category -- instrumentalities of interstate commerce. See <u>Ashwander v. Tenn. Valley Auth.</u>, 297 U.S. 288, 347 (1936)(Brandeis, J., concurring)("The Court will not pass upon

a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.").

## A. Congress May Constitutionally Regulate Intrastate Economic Activities That, In The Aggregate, Substantially Affect Interstate Commerce.

The Supreme Court's case law "firmly establishes Congress' power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." Gonzales v. Raich, 125 S. Ct. at 2205. See United States v. Lopez, 514 U.S. at 560 ("Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained."); United States v. Morrison, 529 U.S. at 610 ("[W]e have upheld a wide variety of congressional Acts regulating intrastate economic activity where we have concluded that the activity substantially affected interstate commerce.")(citation omitted). In Gonzales v. Raich, the Supreme Court set forth a broad definition of economic activities to include not only the "production" and "distribution" of commodities, but their "consumption" as well. 125 S. Ct. at 2211 ("'Economics' refers to 'the production, distribution, and consumption of commodities.'")(quoting Webster's Third New International Dictionary 720 (1966)). When regulated activities can be classified as economic in nature, then, as the Supreme Court articulated in Gonzales v. Raich, it is not a court's role to determine whether the regulated "activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." 125 S. Ct. at 2208 (quoting United States v. Lopez, 514 U.S. at 557).

-10-

The Supreme Court first defined this aggregation doctrine in <u>Wickard v. Filburn</u>, 317 U.S. 111, 128-29 (1942). In <u>Wickard</u>, the Supreme Court held that Congress' Commerce Clause authority supported the federal regulation of home-grown wheat, which was planted, cultivated, and consumed within the intrastate confines of a family farm. <u>See</u> <u>id.</u> The Supreme Court reasoned that, because rising market prices could draw this home-grown wheat into the interstate market and undermine Congress' price control scheme, "Congress had a rational basis for believing that, when viewed in the aggregate, leaving home-consumed wheat outside the regulatory scheme would have a substantial influence on price and market conditions." <u>Gonzales v. Raich</u>, 125 S. Ct. at 2207. "<u>Wickard</u> thus establishes that Congress can regulate purely intrastate activity that is not itself 'commercial,' in that it is not produced for sale, if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity." <u>Id.</u> at 2206.

Over sixty years later, the Supreme Court reaffirmed the ongoing validity of the aggregation doctrine. In <u>Gonzales v. Raich</u>, the Supreme Court upheld Congress' authority to prohibit the intrastate manufacture and possession of marijuana for medical purposes. <u>See</u> 125 S. Ct. at 2201. Like the wheat at issue in <u>Wickard v. Filburn</u>, the Supreme Court reasoned that high demand increased the likelihood that the respondents' home-grown marijuana would be drawn into the interstate market, thus frustrating congressional efforts to eliminate the commodity entirely. <u>See</u> <u>id.</u> at 2206-07. The Supreme Court found rational Congress' conclusion that, if left unregulated, home-grown

marijuana could, in the aggregate, have "a substantial effect on supply and demand in the national market." Id. at 2207.

### 1. Congressional findings.

Any congressional findings regarding the regulated activity's impact on interstate commerce may inform the court's inquiry. We recently rejected an as-applied challenge to § 2251(a) in United States v. Jeronimo-Bautista, 425 F.3d 1266 (10th Cir. 2005). Although Jeronimo-Bautista involved an as-applied challenge to § 2251(a) rather than a facial challenge, its reasoning and findings are instructive in this case. As we did in Jeronimo-Bautista, we start here with congressional history. In Jeronimo-Bautista, we cited, extensively, the congressional history of the Act:

> When Congress first passed the Protection of Children Against Sexual Exploitation Act of 1977, it noted that child pornography . . . has become a highly organized, multimillion dollar industry that operates on a nationwide scale . . . and that the sale and distribution of such pornographic materials are carried on to a substantial extent through the mails and other instrumentalities of interstate and foreign commerce. Findings supporting the 1977 Act also noted that since the production, distribution and sale of child pornography is often a clandestine operation, it is extremely difficult to determine its full extent. At present, however, a wide variety of child pornography is available in most areas of the country. Moreover, because of the vast potential profits involved, it would appear that this sordid enterprise is growing at a rapid rate.
>
> Amendments to the Act in 1984 eliminated the requirement that the production, receipt, transportation, or distribution of child pornography be for a pecuniary profit. The purpose of this amendment was to eliminate an enforcement gap in the statute: Many of the individuals who distribute materials covered [by the statute] do so by gift or exchange without any commercial motive and thus remain outside the coverage of this provision. Likewise, in 1984, in support of § 2251, Congress echoed its findings supporting the original 1977 legislation, stating in part that child

-12-

pornography has developed into a highly organized, multi-million-dollar industry which operates on a nationwide scale.

In 1996, Congress further amended the Act regarding the electronic creation of child pornography. The findings supporting those amendments noted that the existence of . . . child pornographic images . . . inflames the desires of child molesters, pedophiles, and child pornographers who prey on children, thereby increasing the creation and distribution of child pornography. Congress also stated that prohibiting the possession and viewing of child pornography will encourage the possessors of such material to rid themselves of or destroy the material, thereby helping to protect the victims of child pornography and to eliminate the market for the sexual exploitative use of children. Finally, in a 1998 amendment to the Act, a jurisdictional element was added to cover child pornography created using materials that have been mailed, shipped, or transported in interstate or foreign commerce by any means. This addition reflected Congress' concern about federal law enforcement's current inability to prosecute a number of cases where the defendant produced the child pornography but did not intend to transport the images in interstate commerce.

425 F.3d at 1269-71 (citations, footnotes, and internal quotations omitted).

As we acknowledged in Jeronimo-Bautista, "Congress may not have engaged in specific fact finding regarding how the intrastate production of child pornography substantially affects the larger interstate pornography market." Id. at 1271. The Supreme Court, however, "has 'never required Congress to make particularized findings to legislate.'" Id. (quoting Raich 125 S. Ct. at 2208). The Supreme Court in Raich explained:

While congressional findings are certainly helpful in reviewing the substance of a congressional statutory scheme, particularly when the connection to commerce is not self-evident, and while we will consider congressional findings in our analysis when they are available, the absence of particularized findings does not call into question Congress' authority to legislate.

-13-

125 S. Ct. at 2208.

In Raich, the Court emphasized that it had "never required Congress to legislate with scientific exactitude. When Congress decides that the 'total incidence' of a practice poses a threat to a national market, it may regulate the entire class." 125 S. Ct. at 2206-07. Here, Congress made findings regarding intrastate commerce. The legislative history of § 2251(a), cited above, explains why Congress included local activities within the scope of its regulatory scheme. In Jeronimo-Bautista, upon review of the statute's legislative history that we quoted above and in agreement with the First Circuit, we accordingly concluded that "Congress' explicit findings regarding the extensive national market in child pornography and the need to diminish that national market support the contention that prohibiting the production of child pornography at the local level helps to further the Congressional goal." 425 F.3d at 1271 (quoting United States v. Morales-de Jesus, 372 F.3d 6, 12 (1st Cir. 2004)).[3]

### 2.    The economic nature of the regulated activity.

We must next determine whether the challenged statute has anything to do with "commerce" or economic enterprise, however broadly one might define

---

[3] We agree with the district court's suggestion that the legislative history of these statutes may, in fact, be "outdated," because much of the data on which Congress relied predates the explosion of child pornography and Internet access in recent years. Order Denying Motion to Dismiss, at 11. We further share the district court's suspicion that the current market for child pornography is even more far reaching and poses an even greater threat to children and society than did the market that existed when Congress originally enacted these statutes. See id. at 11-12.

those terms. The district court considered § 2251 and concluded that "there can be little disagreement that production of child pornography is economic in nature." Order Denying Motion to Dismiss at 9 (citing United States v. Buculei, 262 F.3d 322, 329 (4th Cir. 2001)).

We also have no hesitation finding that the production of child pornography is economic in nature. The Supreme Court has acknowledged the interstate market for child pornography. See Ashcroft v. Free Speech Coalition, 535 U.S. 234, 249 (2002); New York v. Ferber, 458 U.S. 747, 760 (1982); Osborne v. Ohio, 495 U.S. 103, 110 (1990). See also United States v. Buculei, 262 F.3d at 329. Additionally, the congressional findings cited above indicate that production of child pornography is economic in nature. The Protection of Children Against Sexual Exploitation Act of 1977 (hereinafter "Act") prohibits the production, receipt, transmission and possession of child pornography. See 18 U.S.C. §§ 2251, 2252, 2252A. By this Act, Congress has undertaken to extinguish the interstate market for child pornography. The Commerce Clause permits that exercise of power.

Unlike the regulated activity in Lopez and Morrison, the nature of producing child pornography -- even purely intrastate -- makes it an economic activity. There is undoubtedly a market for it. This conclusion is suggested by the numerous congressional findings and those of other circuits, which show that child pornography is a multimillion dollar industry operating on a nationwide

-15-

scale.

Additionally, the Supreme Court's decision in Gonzales v. Raich supports the district court's conclusion that § 2251(a) regulates economic activities. Section 2251(a)'s prohibition on the production of child pornography fits squarely within Gonzales v. Raich's definition of "economic," which explicitly encompasses the "production" of a commodity. 125 S. Ct. at 2211. See United States v. Jeronimo-Bautista, 425 F.3d at 1269-71 ("Like the [Controlled Substances Act in Raich], the child pornography statutes regulate the 'production, distribution, and consumption of commodities for which there is an established, and lucrative, interstate market.' Congress' prohibition against the intrastate possession or manufacture of child pornography 'is a rational (and commonly utilized) means of regulating commerce in that product.'")(quoting Gonzales v. Raich 125 S. Ct. at 2211 and citing United States v. Morales-de Jesus, 372 F.3d 6, 12 (1st Cir. 2004)).

### 3. Link between production of child pornography and its substantial effect on interstate commerce.

"[T]he task before us is a modest one. We need not determine whether [Croxford's] activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." Gonzales v. Raich, 125 S. Ct. at 2208.

Wickard and Raich control our analysis of the link between the regulated

-16-

activity and its effect on interstate commerce. See United States v. Jeronimo-Bautista, 425 F.3d at 1271-73; United States v. Morales-de Jesus, 372 F.3d at 15 ("The seminal case in this area remains Wickard v. Filburn, 317 U.S. 111."). While there are differences between the production of child pornography for personal use here and the commodities in Wickard and Raich,[4] the similarities between this case and Wickard and Raich are strong, and the differences do not have constitutional significance. The differences do not diminish the precedential force of Wickard and Raich.

First, Wickard and Raich involved "a fungible commodity for which there is an established . . . interstate market    ." Gonzales v. Raich, 125 S. Ct. at 2206. As we stated in Jeronimo-Bautista, "[c]hild pornography is [as] equally fungible [as marijuana] and there is no question an established market exists for its sale and exchange." 425 F.3d at 1273. Second, like the farmer in Wickard and the user in Raich, Croxford produced a commodity for, at a minimum, home consumption. Just as the Agricultural Adjustment Act at issue in Wickard "was designed 'to control the volume [of wheat] moving in interstate and foreign commerce,' " Gonzales v. Raich, 125 S. Ct. at 2206 (modification in

---

    [4] For example, the wheat market is a lawful market that Congress sought to protect and stabilize, whereas the marijuana and child pornography markets are unlawful markets that Congress has sought to eradicate. See Gonzales v. Raich, 125 S. Ct. at 2207 n. 29. The difference, however, is if no constitutional import. Congress' power to regulate commerce includes the power to prohibit commerce in a particular commodity. See id.

-17-

original)(quoting Wickard v. Filburn, 317 U.S. at 115), and the Controlled Substances Act at issue in Raich was designed "to control the supply and demand of controlled substances," id. at 2207, the primary purpose of § 2251(a) is to curb the national supply and demand for child pornography, see United States v. Morales-de Jesus, 372 F.3d at 15-16.

Like the Supreme Court in Wickard and Raich, we have no difficulty concluding that Congress had a rational basis for believing that, when viewed in the aggregate, leaving home-consumed child pornography outside the regulatory scheme would have a substantial influence on price and market conditions. A rising demand in the interstate market could raise prices, and thus draw child pornography, originally produced for home consumption, into the interstate market. This resulting increased supply in the interstate market could eventually result in decreased prices, which would then make it less expensive for individuals to purchase child pornography. The diversion of home-created child pornography could frustrate the federal interest in eliminating transactions in the interstate market in their entirety. See United States v. Morales-de Jesus, 372 F.3d at 16-17 ("The prohibition on intrastate production curbs the supply of child pornography at its source, before it is released into the interstate market. . . . Often, as is the case here, it is necessary to control local behavior to ensure the effectiveness of interstate regulation."). The regulation is "squarely within Congress' commerce power because production of the commodity meant for home

-18-

consumption, be it wheat . . ., marijuana or child pornography, has a substantial effect on supply and demand in the national market for the commodity." United States v. Jeronimo-Bautista, 425 F.3d at 1273 (quoting Raich, 125 S. Ct. at 2207).

Moreover, it is virtually impossible to distinguish between child pornography manufactured and distributed intrastate from child pornography manufactured and distributed interstate. Given the enforcement difficulties that attend distinguishing between child pornography produced locally and child pornography produced elsewhere, and concerns about diversion into interstate channels, we conclude that Congress had a rational basis for believing that failure to regulate the intrastate manufacture and possession of child pornography would leave a gaping hole in its attempt to eliminate the market for child pornography. The failure of Congress to regulate the intrastate activity at issue here "could . . . undercut" its regulation of interstate commerce. United States v. Lopez, 514 U.S. at 561. Thus, as in Wickard and in Raich, Congress' enactment of comprehensive legislation to regulate the interstate market in the commodity of child pornography, is within its authority "to regulate Commerce . . . among the several States." U.S. Const. art I, § 8. "That the regulation ensnares some purely intrastate activity is of no moment." Gonzales v. Raich, 125 S. Ct. at 2209. The Supreme Court in Raich refused to excise individual components of that larger scheme. We should not do so either.

In light of the wealth of congressional findings on child pornography's

effect on interstate commerce, and Supreme Court and Tenth Circuit precedent, we conclude that Congress rationally found that the intrastate production of child pornography, in the aggregate, substantially affects interstate commerce. Cf. Gonzales v. Raich, 125 S. Ct. at 2219 (Scalia, J., concurring in the judgment)("That simple possession is a non-economic activity is immaterial to whether it can be prohibited as a necessary part of a larger regulation.").

### 4. Express jurisdictional element.

We noted in Jeronimo-Bautista:

> Section 2251(a) includes a jurisdictional element as required by the Lopez/Morrison factors. While other courts have questioned the sufficiency of § 2251(a)'s jurisdictional element, see Morales-de Jesus, 372 F.3d at 13-14; [United States v.] Holston, 343 F.3d [83,] 88-89 [(2d Cir. 2003)]; [United States v.] Rodia, 194 F.3d [465,] 471-74 [(3rd Cir. 1999)], we need not linger on this issue. In light of the Supreme Court's ruling in Raich, and our conclusion that the activity regulated in this case has a substantial impact on interstate commerce, any "failure of the jurisdictional element effectively to limit the reach of the statute is not determinative."

425 F.3d at 1273 n. 4 (quoting United States v. Holston, 343 F.3d at 89).

Here the "activity on the whole" -- when reviewed through the lens of the remaining Lopez-Morrison factors -- "bears a significant relationship to interstate commerce." United States v. Holston, 343 F. 3d at 89. Thus, when Croxford argues that the statute's jurisdictional element, requiring that the regulated child pornography must have been produced using materials that have been mailed, shipped, or transported in interstate or foreign commerce, lacks a principled limit

-20-

on Congress' authority to regulate, that objection is not sufficient, alone, to defeat Congress' legislative authority to enact this statute.  See Appellant's Brief at 19-20.[5]

The district court, citing United States v. Rodia, 194 F.3d at 471-73, held, along with several circuits, that this "materials-in-commerce" jurisdictional element, on its own, is inadequate to confer congressional authority over the intrastate production and simple possession of child pornography.  Order Denying Motion to Dismiss, at 10.  Despite this conclusion, the district court upheld the statute, reasoning that the jurisdictional element did not bear sole responsibility for establishing the statute's impact on interstate commerce.  See id. at 13.  We do not believe that we need to decide this issue because we hold that Congress rationally concluded that the regulated activities, in the aggregate, substantially affect interstate commerce, and, hence, acted within its constitutional authority in enacting this statute, irrespective of the sufficiency of the statute's jurisdictional element.  See United States v. Holston, 343 F.3d at 89; United States v. Morales-de Jesus, 372 F.3d at 21 ("[T]he disconnect between the interstate commerce

_____

[5] In his brief, Croxford also implies that, because the statute contains a "materials-in-commerce," rather than a "substantially affects commerce" jurisdictional element, we may only evaluate the statute's constitutionality under Lopez' second category.  See Appellant's Brief at 18-19.  The appellant, however, cites no authority for this proposition, and we have not found any case law to support this assertion.  Croxford's position lacks merit.  Congress' task is to pass constitutional legislation; the courts' task is to interpret and apply constitutional laws.  That Congress may have read Supreme Court cases and tried to ensure the constitutionality of its legislation by one means does not preclude the law enacted from being constitutional on other grounds.

activity described in the jurisdictional element of § 2251(a) and the interstate commerce activity (the national market for child pornography) that prompted Congress to criminalize the production of child pornography is not fatal to the constitutionality of the statute.").

**B.** **Lopez and Morrison do not Suggest a Different Result.**

Croxford places heavy reliance on the Supreme Court's decisions in United States v. Lopez and United States v. Morrison. The statutes at issue in those two cases, however, were different from the statute at issue in this case. "At issue in *Lopez* was the validity of the Gun-Free School Zones Act of 1990, which was a brief, single-subject statute making it a crime for an individual to possess a gun in a school zone." Gonzales v. Raich, 125 S. Ct. at 2209 (citation omitted). Morrison involved the Violence Against Women Act of 1994 which "created a federal civil remedy for the victims of gender-motivated crimes." Id. at 2210. Unlike the Protection of Children Against Sexual Exploitation Act of 1977, the statutes at issue in Lopez and Morrison were not "a comprehensive framework for regulating the production, distribution, and possession of [a commodity]." Id.

In both Lopez and Morrison, the parties asserted that the statute at issue fell outside Congress' power in its entirety. Croxford, however, does not suggest that Congress has no power to regulate child pornography; he argues that § 2251(a) is unconstitutional because it implicates purely intrastate activity. This distinction is pivotal. The Supreme Court has often reiterated that, "[w]here the class of

activities is regulated and that class is within the reach of federal power, the courts have no power 'to excise as trivial, individual instances' of the class." Gonzales v. Raich, 125 S. Ct. at 2209 (citing Perez v. United States, 402 U.S. 146, 154 (1971)).

In Lopez, the Supreme Court distinguished the Gun-Free School Zones Act of 1990 from other statutes that it had upheld:

> Section 922(q) is a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however, broadly one might define those terms. Section 922(q) is not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated.

United States v. Lopez, 514 U.S. at 561. The Supreme Court concluded the statute was invalid because it "did not regulate any economic activity and did not contain any requirement that the possession of a gun have any connection to past interstate activity or a predictable impact on future commercial activity." Gonzales v. Raich, 125 S. Ct. at 2209.

Similarly, in Morrison, the Supreme Court explained that "thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature." United States v. Morrison, 529 U.S. at 613. The Supreme Court held the Violence Against Women Act of 1994 unconstitutional because it did not regulate economic activity. See id. ("Gender-motivated crimes of violence are not, in any sense of

the phrase, economic activity.")

The statutory scheme that the United States is defending in this litigation is more similar to the statutory scheme in Wickard and in Raich than to the statutes in Lopez and Morrison. The Act aims to extinguish the interstate market for child pornography by prohibiting its production, receipt, transmission and possession. Because the Act is a statute that directly regulates economic activity, the Supreme Court's opinions in Lopez and Morrison do not cast doubt on its constitutionality.

## II. SECTION 2251(a) IS CONSTITUTIONAL AS APPLIED TO THE INTRASTATE PRODUCTION OF CHILD PORNOGRAPHY.

Croxford argues that the statute in question is unconstitutional as applied to him. The Supreme Court analysis in Gonzales v. Raich controls our analysis of Croxford's as-applied challenge to § 2251(a). Because § 2251(a) is a facially proper exercise of Congress's Commerce Clause power and Croxford's conduct falls within the regulated class, any as-applied challenge to the statute based on arguments that his conduct was not sufficiently commercial or did not implicate interstate commerce because the depictions never crossed state lines, must necessarily fail. Raich makes clear that the Commerce Clause grants Congress the power to regulate an entire class of activities that substantially affects interstate commerce, even if the commercial effect of an individual instance within the class is slight. Here, Croxford sexually exploited a nine-year-old girl in his custody, and such exploitation is within the bounds of what Congress

intended to proscribe by its enactment of § 2251(a).

The conduct in United States v. Jeronimo-Bautista, 425 F.3d 1266, where we rejected an as-applied challenge to § 2251(a), was arguably more localized with less evidence of intent to distribute or sell than the facts currently before us. In Jeronimo-Bautista, the defendant, with two other men, entered a vacant residence with a 13-year old girl, and after the girl became unconscious, removed her clothing, sexually assaulted her, and took photographs of their actions. See id. at 1268. We held that Congress' decision, that the defendant's local production of child pornography is illegal conduct, represents a "rational determination that such local activities constitute an essential part of the interstate market for child pornography that is well within Congress' power to regulate." Id. at 1273. We found, relying on Raich, that "the intrastate production of child pornography could, in the aggregate, have a substantial effect on the interstate market for such materials." Id. at 1272-73. The photographs in Jeronimo-Bautista were not disseminated, nor were they stored or transmitted electronically via the Internet, the United States Postal Service, or any other method crossing state lines or internationally. See id. at 1268. Here, images were stored on computer diskettes, and were downloaded on a computer, and Croxford had easy access of dissemination as an Internet provider. Croxford's as-applied challenge is weaker than that in Jeronimo-Bautista, and in accordance with that decision, Croxford's as-applied challenge necessarily fails.

-25-

Croxford cites to two circuit courts and some district courts that have reached the conclusion that § 2251(a) is unconstitutional as applied to the defendants before them. See McCoy v. United States, 323 F.3d 1114, 1132 (9th Cir. 2003); United States v. Corp., 236 F.3d 325, 332 (6th Cir. 2001); United States v. Jeronimo-Bautista, 319 F. Supp. 2d 1272, 1282 (D. Utah 2004)[6]; United States v. Matthews, 300 F. Supp. 2d 1220, 1237 (N.D. Ala. 2004). In United States v. Morales-de Jesus, the First Circuit articulated two situations where child pornography as-applied challenges may arise. See 372 F.3d at 17-19 (2004). First, as-applied challenges may arise when a defendant argues that his conduct does not impact commerce because the perpetrator does not intend to sell or distribute the visual depiction. See id. at 18. This argument fails, because Congress' power to prohibit this conduct does not rely on the economic facts of a single case, but instead relies on its power to control an entire class of conduct. See id.

The First Circuit acknowledged that as-applied challenges may also arise that "focus on facts other than the economic facts of the particular case. These facts could include the age of the minor, the relationship between the defendant and the minor, the nature of the allegedly sexually explicit conduct, and the nature of the visual depiction of that conduct." See id. The district court

---

[6] We reversed and remanded United States v. Jeronimo-Bautista, 319 F. Supp. 2d 1272 in United States v. Jeronimo-Bautista, 425 F.3d 1266.

-26-

accepted this rationale, explaining that, when the conduct involved nude pictures of a mother and daughter or an almost eighteen-year-old victim who consented to the activity, the statute might become unconstitutional as applied. See Order Denying Motion to Dismiss at 15. See also United States v. McCoy, 323 F.3d at 1132; United States v. Corp., 236 F.3d at 332. We need not decide whether the particular facts of a case could ever give rise to an as-applied challenge. Rather, we need only determine whether this rationale supports an as-applied challenge to this case's facts. Here, Croxford intentionally exploited two young children while he had custody over them. He had the means, as an Internet provider, to distribute the pictures. He also had thousands of images of child pornography on his computer. Thus, the child pornography statute is a proper exercise of Congress' Commerce Clause authority, and the district court did not unconstitutionally apply it to Croxford's conduct.

## III. THE DISTRICT COURT'S SENTENCE DID NOT VIOLATE BOOKER.

In Blakely, the Supreme Court held that the Sixth Amendment, in a state prosecution, "requires that the maximum permissible sentence in a particular case must be determined solely by reference to 'facts reflected in the jury verdict or admitted by the defendant.'" United States v. Wilson, 416 F.3d 1164, 1171 (10th Cir. 2005)(quoting Blakely v. Washington, 542 U.S. at 302). In Booker, the Court extended the Blakely reasoning to the Federal Sentencing Guidelines,

"holding that the Sixth Amendment requires that 'any fact (other than a prior conviction) . . . necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt.'" Id. (quoting United States v. Dazey, 403 F.3d 1147, 1174 (10th Cir. 2005)). "[T]he Court [in Booker] severed the provision of the Sentencing Reform Act making application of the Guidelines mandatory." United States v. Wilson, 416 F.3d at 1171 (citation omitted).

In cases where sentencing occurred before Booker, we have recognized two sentencing errors: (i) constitutional Booker error occurs when the district court relies on "judge-found facts, other than those of prior convictions, to enhance a defendant's sentence mandatorily;" and (ii) non-constitutional Booker error occurs where the district court applies "the Guidelines in a mandatory fashion, even though the resulting sentence was calculated solely upon facts that were admitted by the defendant, found by the jury, or based upon the fact of a prior conviction." Id. at 1171-72 (quoting United States v. Gonzalez-Huerta, 403 F.3d 727, 731-32 (10th Cir. 2005)). The district court committed neither constitutional nor non-constitutional Booker error. The court did not enhance the sentence in a mandatory fashion, but rather applied the Guidelines in an advisory manner. The sentencing issue Croxford raises is what has become the "garden variety" assertion we are frequently seeing -- that the district court violated his

constitutional right by enhancing his sentence based on judicially-found facts to which he has not pled guilty and which were not charged in the indictment. By applying our post-Booker jurisprudence, we conclude that no constitutional error occurred here. The district court anticipated the holding in Booker and did not apply the Guidelines in a mandatory fashion, but rather, only applied the Guidelines in an advisory fashion. Croxford stipulated in his plea agreement that sometime before November 2002 he took sexually explicit photographs of his adopted daughter with his digital camera, that he used a computer, and that he used materials transported in interstate commerce when creating these images.

Booker directs a court to consider the factors laid out in § 3553(a), including the now-advisory guideline ranges, when determining the sentence. See Booker, 125 S. Ct. at 757. Though the district court did not specifically refer to 18 U.S.C. § 3553(a) in determining Croxford's sentence, it considered many of the factors listed under the statute as well as the Guidelines and the district court sentenced Croxford to a sentence within the Guideline range. See United States v. Kelley, 359 F.3d 1302, 1305 (10th Cir. 2004)("[W]e have made it quite clear that the sentencing court is not required to consider individually each factor listed in § 3553(a) before issuing a sentence.")(citations omitted).

The district court did not sentence Croxford in violation of the Fifth and Sixth Amendment, and Croxford's sentence is constitutional under Blakely and under Booker.

## **CONCLUSION**

Accordingly, for the reasons stated above, we affirm the district court's order of dismissal and the defendant's sentence.

Entered for the Court

James O. Browning
District Judge